## L. SMIRLOCK REALTY CORP., Respondent-Appellant, v TITLE GUARANTEE COMPANY, Appellant-Respondent.

Second Department, November 28, 1983

**APPEARANCES OF COUNSEL**

*Permut & Boyle* (*John J. Boyle* and *Michael Permut* of counsel), for appellant-respondent.

*Suozzi, English & Cianciulli, P.C.,* for respondent-appellant.

*Ruskin & Gyory* (*Richard Gyory* and *Herbert B. Ruskin* of counsel), for New York State Land Title Association, *amicus curiae.*

### OPINION OF THE COURT

GIBBONS, J.

We are called on in these appeals to review several questions pertaining to the determination and measure of damages recoverable by a fee holder in a suit on a policy of title insurance. Of particular importance is the measure of damage in a situation where there has been a partial failure of the insured's title. Related matters include the date which should be used for the purpose of computing the value of any loss, whether improvements to the property made subsequent to the policy's execution should be taken into account, and the propriety of the trial court's award of interest. Finally, there is the question of the insurer's right of subrogation to a mortgage where the insurer has paid to the fee holder's mortgagee a sum of money in satisfaction of a claim by the mortgagee on a separate policy of title insurance protecting it against title defects.

### FACTS AND PROCEEDINGS

*Background*

This case was remitted by the Court of Appeals to the Supreme Court, Nassau County, for a trial on the issue of damages, the Court of Appeals having determined that defendant could not avoid its obligation under the title policy existing between it and the plaintiff (*Smirlock Realty Corp. v Title Guar. Co.*, 52 NY2d 179). The trial as to damages has now been held, and both parties have appealed.

Both the above-cited decision of the Court of Appeals and our previous decision when this case was last before us (*Smirlock Realty Corp. v Title Guar. Co.*, 70 AD2d 455) include detailed factual recitations, so it is unnecessary to set forth here a complete description of the background to this litigation. However, a partial exposition will be helpful, and, of course, events which pertain to the damages issues need to be highlighted.

On May 14, 1969, plaintiff purchased a certain warehouse property, located at 31-39 Carvel Place, Inwood,

New York, from Bass Rock Holding, Inc. (Bass Rock), for the sum of $600,000. A foreclosure proceeding against Bass Rock had been instituted earlier that year. Plaintiff paid approximately $65,000 and gave $20,000 in notes at the closing, took title subject to two prior mortgages held by the Jefferson County Savings Bank (the bank) and gave a mortgage to that bank for the balance of the purchase price, after which all three mortgages were consolidated into a new mortgage lien of $535,000. On the date of the closing defendant issued two title policies, one to plaintiff and the other to the bank. The plaintiff's fee ownership of the property was covered for $600,000, while the mortgage interest of the bank was insured for $535,000.

At the time of sale, access to the property was over three public streets: Carvel Place to the north and St. George Place and Jeanette Avenue to the east. The warehouse loading docks for larger trucks were located at the easterly end of the building, with direct access from St. George Place and Jeanette Avenue. In addition, an alley connected Carvel Place with this loading dock area. However, because of the size of the alley, large trucks could not use this route.

Some two years prior to the closing date, the roadbeds of St. George Place and Jeanette Avenue and a small slice of land along Carvel Place had been condemned by the Town of Hempstead for urban renewal purposes. As described in our prior decision, at the time of closing plaintiff did have reason to know of the Carvel Place taking. However, it did not know about the condemnation of the St. George Place and Jeanette Avenue roadbeds (*Smirlock Realty Corp. v Title Guar. Co.,* 70 AD2d 455, 461, *supra*). No exception was listed in either title insurance policy for any condemnation pertaining to the three streets. Apparently, defendant's title searcher had neglected to make the appropriate inquiry in the Nassau County Clerk's office, which would have revealed the condemnations.

Commencing the day after the acquisition of the property, plaintiff leased the premises to Pan American World Airways, Inc. (Pan Am), for a three-year term, at an annual rental of $118,262.25. Pursuant to its agreement

with Pan Am, within the six-week period following the closing, plaintiff spent $95,000 in improving the property.

On or about November 1, 1971, Jeanette Avenue and St. George Place began to be ripped up pursuant to the urban renewal plan of the Town of Hempstead. That plan required the closing of the warehouse access routes via these streets. Pan Am began to remove its property from the premises but continued to pay rent up through April 14, 1972. It did not pay rent for May of that year, the last month of the lease term.

Recognizing the problems closure of St. George Place and Jeanette Avenue would cause, representatives of plaintiff and defendant met before Christmas of 1971 to discuss what should be done. An accord, apparently never reduced to writing, was reached whereby plaintiff was to bring an inverse condemnation proceeding, during which, according to plaintiff, defendant would carry the mortgage and tax expenses while plaintiff would bear the expense of maintaining the building. During the period following the accord, plaintiff, albeit unsuccessfully, made fairly extensive efforts to rent or sell the property.

In the inverse condemnation proceeding, plaintiff contested the vesting of title to the beds of St. George Place and Jeanette Avenue, and also argued, in the alternative, that as a result of the condemnation, its property became landlocked. In an opinion by Justice Hogan, dated February 22, 1973, the Supreme Court, Nassau County, held against plaintiff. Plaintiff appealed to this court from the order denying its claims, and we affirmed, without opinion, on October 1, 1973 (*Matter of Town of Hempstead* [*Smirlock Realty Corp.*], 42 AD2d 1056). On November 15, 1974, the Court of Appeals denied leave to appeal from the final judgment entered in the inverse condemnation proceeding (35 NY2d 643). On August 14, 1973, during the pendency of the inverse condemnation appeal to this court, plaintiff, defendant and the Jefferson County Savings Bank, which had by then changed its name to Community Savings Bank, entered into a triparty agreement, the purpose of which was "to delay the foreclosure of The Bank's mortgage until the determination of said appeal". Pursuant to the agreement, the bank was to forbear from foreclosing on

the mortgage, defendant title company was to pay the real property taxes, and plaintiff was to maintain the premises.

The bank, nevertheless, commenced a foreclosure action on or before July 12, 1974. In May, 1975, plaintiff withdrew its opposition to the foreclosure action, and a judgment of foreclosure and sale was entered on July 2, 1975. The judgment recites, as the sum due, a figure of $555,643.82. The property was sold at public auction, with the bank purchasing it for the sum of $1,000.

The record does not reveal whether the bank sought a deficiency judgment against plaintiff. The bank did finally sell the property to U-Haul of Long Island, Inc. (U-Haul), on May 8, 1978, for $300,000. The bank also made a claim for the full amount of the title policy with defendant. The claim was settled on November 13, 1978, for the sum of $32,500.

In April, 1975, a month before it withdrew its answer in the foreclosure action, plaintiff commenced this suit, seeking to recover, *inter alia,* the sum of $600,000 under its policy of title insurance. In its answer, defendant asserted several affirmative defenses and also counterclaimed for $71,550.08, allegedly for expenses incurred on plaintiff's behalf in forestalling the foreclosure of the property. As already mentioned, the Court of Appeals has held for the plaintiff with respect to defendant's liability under the policy, remitting the matter solely for a trial on damages (*Smirlock Realty Corp. v Title Guar. Co.,* 52 NY2d 179, *supra*). However, the court affirmed the trial court's determination in defendant's favor on the counterclaim (52 NY2d 179, 191, *supra*).

## Evidence as to Damages

Plaintiff's theory of damages, maintained both at trial and on appeal, is that its loss should be measured by "the difference in market value between the property with the encumbrance and without the encumbrance", plus incidental damages. Its attorney stipulated that May 14, 1969 should be used as the valuation date for determining the value of the property, but with the $95,000 worth of improvements being taken into account. Defendant agreed with the May 14, 1969 date but maintained that plaintiff's

loss was only its equity in the property. Furthermore, the improvements were not to be taken into account.

Placing his primary reliance upon the capitalization of income theory of valuation, plaintiff's expert determined that the value of the property at the time of the 1969 sale, as improved and with access via St. George Place and Jeanette Avenue, was $867,500. He arrived at this figure by first estimating the gross rental value of the property "based on comparable rentals and the rental of the property itself to Pan Am". He found a gross potential income of $119,250, and then derived a net income of $79,800 by allowing for various factors and expenses, such as a possible vacancy and taxes. He then found a capitalization rate of 9.2% by using the "band of investment" theory. Capitalizing the net income at this rate brought the expert to his final figure of $867,500. A cost approach and a market approach to determining value were also utilized, primarily as a check on the accuracy of the figure arrived at by income capitalization. The 1969 purchase price of $600,000 was not considered as being important in any of the computations, apparently because the sale was made in the context of a foreclosure proceeding.

Plaintiff's expert then valued the property without access from St. George Place and Jeanette Avenue. He utilized two methods. First, he considered the difficulties plaintiff and then the bank had in renting or selling the property between 1972 and 1978. He noted that U-Haul only brought the property after it had acquired a neighboring lot and that U-Haul's use of the property, the renting of small vehicles, is "somewhat unique". He opined that the "ordinary and usual use of this type of building requires the constant use of large tractor trailers". Utilizing the $300,000 purchase price paid by U-Haul in 1978 and an 8% interest rate compounded annually, he arrived at a 1969 value of $150,000.

In his second method of valuation, plaintiff's expert relied on the report and testimony of another of plaintiff's witnesses, an engineer, who testified as to what it would take to alter the property and building to allow for access by large trucks to the warehouse from Carvel Place. He concluded, based on the resulting reconfiguration of the

building and the cost of reconstruction, that the 1969 value of the property without access from Jeanette Avenue and St. George Place was $206,150. Both plaintiff's expert witnesses, the real estate appraiser and the engineer, testified that large trucks could not approach the present warehouse loading area using the Carvel Place entrance.

While defendant has always maintained that plaintiff's formula for measuring loss, the difference in market value between the property with access and without access, is incorrect and that only plaintiff's equity should be compensated, it nonetheless presented testimony through an expert concerning the value of the property. In this regard, like plaintiff's expert, defendant's expert did not consider the 1969 purchase price to be determinative. He also utilized the income capitalization, market and cost approaches to valuation. With respect to income capitalization, defendant's expert considered the Pan Am lease to be overvalued. Evaluating leases of other properties, he estimated that $72,500 was an appropriate yearly net income for the property. With a capitalization rate determined to be 10%, he concluded that the 1969 value of the property, in good shape, was $725,000. From that 1969 appraised value defendant's expert deducted $75,000 as the cost to cure or to put the property into good shape in the first place, and he then found that the property, at the time of the sale to plaintiff, was worth $650,000. This result compared favorably under his other approaches to valuation.

Defendant's expert made his valuation based on access only from Carvel Place. He acknowledged that he had not made a study of the property with additional street frontages but refused to concede that the property was worth more with access over St. George Place and Jeanette Avenue.

As for incidental damages, plaintiff presented evidence that it had paid $1,500 for attorney fees in the inverse condemnation proceeding. Further, during the years 1972, 1973, and 1974, plaintiff allegedly expended over $27,000 in maintaining the building. Copies of purported United States tax returns for those years, with attached work sheets, were admitted into evidence to establish the cost of maintenance.

*The Decision at Special Term*

The trial court held that the correct formula for determining plaintiff's loss was "the value of the property with and without access via St. George Place and Jeanette Avenue". The court also held that the improvements made by plaintiff pursuant to its commitment to Pan Am were to be considered. The court analyzed the valuations made by both experts concerning the property, assuming full access by all vehicles. It opined that while, on the face of it, it appeared that the expert testimony varied greatly, in fact, the figures were "relatively comparable". It concluded that "the most significant disparity between the experts was their respective capitalization rates". The court went on as follows:

"By adjusting certain of the expert's calculations to neutralize bias and utilizing a 9.6% figure as reflecting a fair return on investment the valuation under the capitalization of income approach become [*sic*]: Plaintiff — $821,020; Defendant — $800,531. The apparent disparity with the figure given by the Defendant's expert is exaggerated in that the Court has not subtracted the cost of rehabilitative repairs since it has found such expenses to be compensable items of loss.

"Taking into consideration the adjusted estimates of value under the income capitalization approach together with the market data submitted by both Parties, this Court finds that the value of the property with access via St. George Place and Jeanette Avenue to be $800,000."

In regard to the value of the property without the use of St. George Place and Jeanette Avenue, the trial court stated: "Defendant's contention and that of its expert that the loss of access from the East via St. George Place and Jeanette Avenue did not adversely affect the value of the property is unworthy of acceptance. The evidence is overwhelming that without this access the easterly portion of the building where the loading docks were located could not be used by tractor trailers. The westerly portion of the building, even if assumed to be accessible to such vehicles, contained the office space and could only be modified at a substantial cost."

The court was not impressed with the valuation of plaintiff's expert which utilized the $300,000 purchase price paid by U-Haul. It stated that this valuation "ignores the fact that Plaintiff realized a return on its investment in the form of the rent paid by Pan American World Airways for the full three year term of the lease". The court commented on the other approach which was based on the cost of reconstruction, and without further explanation, then found "the value of the property after the loss of access to be $200,000". Incidental damages were fixed at $1,500 for legal fees, and $20,177 representing the amount spent on maintenance.

Because defendant had satisfied the bank's claim on the mortgage title policy, the court held that defendant was entitled to be subrogated to the bank's rights as mortgagee. Noting that while the principal of the mortgage debt had been reduced to $409,000 at the time of the bank's foreclosure, "accumulated interest and advances for taxes raised the debt to over $535,000, the face amount of the [mortgage title] policy". Subtracting from the latter figure the value of the property without access, that is, $200,000, the court found that defendant was entitled to a setoff of $335,000.

Finally, the court considered the problem of interest and the date from which it should be computed. It held that "any cause of action which may have existed prior to the date of Justice Hogan's decision * * * was purely theoretical in terms of loss sustained" and that therefore February 22, 1973, the date of that decision, was the appropriate measuring date for interest on plaintiff's loss. The interest on the various sums which comprised incidental damages was to be calculated from the dates upon which the sums were expended.

These appeals ensued.

THE LAW

*Measure of Loss*

By statutory definition, title insurance is the insuring of "owners of real property * * * and other persons lawfully interested therein against loss by reason of defective titles and encumbrances thereon and insuring the correctness of searches for all instruments, liens or charges affecting the

title to such property" (Insurance Law, § 46, subd 18). Section 438 of the Insurance Law requires the filing of all title insurance policy forms with the Superintendent of Insurance. Subdivision 1 of section 440 requires the filing with the superintendent of, among other things, the rates of a title insurance corporation, as well as the rules used in connection with the issuance of title policies. In this regard the New York Board of Title Underwriters, a rating organization under article VIII of the Insurance Law and of which defendant is a member, periodically files a rate manual with the superintendent. The policies at issue here, that is, the fee title policy and the mortgage title policy, are on the uniform policy form of the New York Board of Title Underwriters (see Pedowitz, Title Insurance — What Every New York Lawyer Should Know, 52 NY State Bar J 292, 295, 322).

The printed cover of plaintiff's policy with defendant sets forth the risks insured against and contains a general statement of coverage, as follows:

"THE TITLE GUARANTEE COMPANY

"In Consideration of the payment of its charge for the examination of title and its premium for insurance, insures the within named insured against all loss or damage not exceeding the amount of insurance stated herein and in addition the costs and expenses of defending the title, estate or interest insured, which the insured shall sustain by reason of any defect or defects of title affecting the premises described in Schedule A or affecting the interest of the insured therein as herein set forth, or by reason of unmarketability of the title of the insured to or in the premises, or by reason of liens or incumbrances affecting title at the date hereof, or by reason of any statutory lien for labor or material furnished prior to the date hereof which has now gained or which may hereafter gain priority over the interest insured hereby, or *by reason of a lack of access to and from the premises,* excepting all loss and damage by reason of the estates, interests, defects, objections, liens, incumbrances and other matters set forth in Schedule B, or by the conditions of this policy hereby incorporated into this contract, the loss and the amount to be ascertained in the manner provided in said conditions

and to be payable upon compliance by the insured with the stipulations of said conditions, and not otherwise" (emphasis added).

Schedule B of the policy lists matters which are excepted from the coverage. Included as a typewritten exception is the bank's consolidated mortgage on the property. Finally, there are 12 "conditions" of the policy, several provisions of which are relevant to this case.

■ As can be seen from the statutory definition of title insurance, as well as from the printed cover of the form policy issued by the New York Board of Title Underwriters, "a policy of title insurance is a contract by which the title insurer agrees to indemnify its insured for loss occasioned by a defect in title" (*Smirlock Realty Corp. v Title Guar. Co.*, 52 NY2d 179, 188, *supra*). Furthermore, and beyond "its purely contractual aspects", title insurance is "in the nature of a covenant of warranty against encumbrances" (*Smirlock Realty Corp. v Title Guar. Co.*, 52 NY2d 179, 188, *supra*).

It follows from the nature of title insurance that an insured is entitled to be reimbursed for his actual loss, up to the limit of the policy (*Empire Dev. Co. v Title Guar. & Trust Co.*, 225 NY 53; see 9 Appleman, Insurance Law & Prac [rev vol], § 5216; 15A Couch, Insurance [2d ed], § 57:179). This is, at once, a restrictive and expansive statement of damages. It is restrictive in that conjectural lost profits are not included (see 15A Couch, Insurance [2d ed], § 57:179). It is expansive in that the insured is protected against more than just nominal damages or out-of-pocket expenses (*Montemarano v Home Tit. Ins. Co.*, 258 NY 478).

Generally speaking, what the words "loss or damage" mean is to be determined by the definitions and standards accepted by the parties (*Empire Dev. Co. v Title Guar. & Trust Co., supra,* pp 59-60), subject to any applicable government regulation. In this case, the policy does explicitly and in detail set forth the types of, and occasions for, losses covered by the policy. However, it is practically silent on the question of how to measure the value of loss or damage. There is no provision which expressly addresses this very important issue. We thus must resort to general rules of

contract interpretation, in particular, taking into account the purpose and object of the contract.

It has been remarked that the determination of damages, with respect to a title insurance policy, is a subject which "is muddled in hopeless confusion" (Note, The Insured's Rights Against the Title Insurer, 6 Western Reserve L Rev 49, 60). To some degree this confusion, reflective of both inconsistent judicial opinion and uncertain analysis, may be the result of the infrequency with which title companies and their insureds litigate against each other (see Johnstone, Title Insurance, 66 Yale LJ 492, 501-502). Furthermore, it has been noted that where there has been litigation, "[t]he cases contain only a few sporadic statements concerning the criterion of value for measuring an owner's recovery under a title policy" (see Measure, Extent, or Amount of Recovery on Policy of Title Insurance, Ann., 60 ALR2d 972, 978). It is, therefore, not surprising that the parties maintain positions which are diametrically opposed to each other, each citing authorities. As already mentioned, plaintiff contends that it is entitled to the difference in market value between the property with the defect in title and without such defect. Reliance is placed on, among other sources, the case of *Glyn v Title Guar. & Trust Co.* (132 App Div 859). Defendant, on the other hand, argues that actual loss is to be measured by the insured's equity in the property, citing our decision in *Grimsey v Lawyers Tit. Ins. Corp.* (38 AD2d 572, mod on other grounds 31 NY2d 953). A similar view is expressed in the brief of the New York State Land Title Association as *amicus curiae*. According to that organization, a title policy is a species of valued policy, the value being set by the purchase price. The loss to be recompensed is measured by the purchase price less the amount due on any mortgage agreement.

In *Glyn v Title Guar. & Trust Co.* (*supra*) the plaintiff purchased property which was encroached upon by neighboring structures which had been in existence for over 20 years. Noting that the encumbrances were such that "the owner could not at will remove [them]", the court held that the measure of the plaintiff's damages was "the difference between the value of the property when purchased, as it

was with the encroachments, and its value as it would have been if there had been no such encroachments" (*Glyn v Title Guar. & Trust Co., supra,* p 863). In *Glyn,* the insured suffered a partial loss in the value of the property.

Defendant argues that the applicable case is not *Glyn,* but rather *Grimsey v Lawyers Tit. Ins. Corp. (supra),* wherein this court said "[b]ecause indemnity is the nature of the title insurance contract at bar, plaintiffs are entitled only to the recovery of their actual loss and *may not recover the value of the fee"* (38 AD2d 572, 573, *supra;* emphasis supplied). *Grimsey* was a total loss case wherein the plaintiff bought land that did not belong to the grantor. The purchase price was $65,000, with the plaintiff paying $25,000 cash and giving a purchase-money mortgage for the balance. Almost one year after the purchase, the plaintiff learned that the county held the fee. The trial court, among other things, held that the plaintiff was entitled on his policy to $65,000 for the loss of the fee. This court disagreed, allowing the plaintiff only $25,000, the amount of his initial investment. The case was appealed to the Court of Appeals, but only by the defendant title company, with respect to an award of the plaintiff's counsel fees (*Grimsey v Lawyers Tit. Ins. Corp.,* 31 NY2d 953, *supra*). Thus, we have no final determination by the Court of Appeals in *Grimsey* regarding the correctness of the valuation of the loss in that case.

Because *Grimsey* was a total loss case, whereas the case at bar involves a partial loss, as did *Glyn,* it is tempting to simply say that *Glyn* and not *Grimsey* sets forth the controlling rule as to damages. However, such would result in a very dissatisfying situation, wherein a fee holder facing a total loss may be entitled to far less compensation, other things being equal, than a fee holder facing a partial loss, because of the radically different formulae utilized. The application of one formula, predicated on the influence a defect has on the value of the property, and another formula, utilized when the defect is total, wherein the value of the property is irrelevant and the loss is measured by the consideration or equity, does not provide a particularly coherent theory of loss. Rather, we should search for an underlying principle of damages which would lead to harmonious results, whether the loss is partial or total.

The roots of the difficulty appear to go back to the early development of the concept of title insurance, when it made its appearance in this country during the last half of the Nineteenth Century (see Johnstone, Title Insurance, 66 Yale LJ 492). The writers considering this new form of insurance gave short shrift to the question of damages by simply analogizing them to those found in an action brought by a grantee against his grantor for breach of the various covenants of title (see, e.g., 3 Sutherland, Damages [4th ed], § 840a). Thus, where there was a total absence or loss of title, it was stated that an insured under a title policy should receive as damages what he would receive for a breach of the covenant of seizin or warranty of title, that is, the consideration paid (see *Murphy v United States Tit. Guar. Co.*, 104 Misc 607; see, also, *Hunt v Hay*, 214 NY 578). On the other hand, where the breach of the title policy pertained only to an encumbrance, damages were analogized to those existing where there had been a breach of the covenant against encumbrances (*Murphy v United States Tit. Guar. Co., supra*). The measure of damages in the latter context is that set forth in *Glyn* (132 App Div 859, *supra*): either the cost of removal, or, alternatively, the difference in value between the land with the servitude and without it (*City of New York v New York & South Brooklyn Ferry & Steam Transp. Co.*, 231 NY 18, 24).

By indiscriminately extending the law of covenants of title to the measure of damages for breach of a title insurance policy, the early authorities ignored the unique history of covenants of title. The covenant of seizin and the the warranty of title do not generally follow the rules of contract law and are not covenants of indemnity. They are derived from the rules of feudal tenure and the relationships of lord and vassal (see Measure of Damages for Breach of Covenants of Title in Conveyances or Mortgages of Real Property, Ann., 61 ALR 10). In the system of feudal tenure, land did not have a market price; the value of land "depended not upon a pecuniary rental but upon the personal services which its holding entailed" (3 Sedgwick, Damages [9th ed], § 951). A lord had the obligation of ensuring his vassal's enjoyment of his feud. The latter's remedy, if the land were, for whatever reason, taken, was

to be put in possession of lands as good as those lost, a kind of specific performance. "The idea of the loss of a good pecuniary bargain was foreign to the existing legal and social order. As the value of land was not measured in money, so there was no fluctuation in the market, and purchasers did not acquire title with the intention of subsequently conveying to a new purchaser at a profit. Even when the next step was taken and the ordinary purchase and sale of lands began to become common, the idea of fluctuation in value was not thought of, and the consideration named in the deed began to be regarded as a pecuniary equivalent for the old agreement to enfeoff of lands of equal value. Instead of getting land of equal value the plaintiff was to get what both parties had by consent substituted for it — the consideration" (3 Sedgwick, Damages [9th ed], § 951, pp 1966-1967).

A covenant or warranty against encumbrances differs from a covenant of seizin or a warranty of title in that many elements or principles of contract law appear applicable. Thus, a covenant against encumbrances looks past the time of sale, in the sense that the warrantor must make good on his warranty, putting the warrantee in as good a state as if the covenant or warranty had been kept (*Thayer v Clemence,* 22 Pick [39 Mass] 490). A covenant against encumbrances is distinguishable from a covenant of seizin in that it "is to be regarded as a covenant of indemnity" (Measure of Damages for Breach of Covenants of Title in Conveyances or Mortgages of Real Property, Ann., 61 ALR 10, 61; see *McGuckin v Milbank,* 152 NY 297, 302). Not surprisingly, courts have been quick to seize on this difference and the rule that the appropriate measure of damages, where there is a breach of a covenant against encumbrances, is the diminution of value rather than the consideration paid, in order to grant justice to an injured grantee (see, e.g., *Hymes v Esty,* 133 NY 342, 348).

The measure of damages for a breach of the covenant of seizin or warranty of title based on the consideration paid was criticized by the Court of Appeals as long ago as 1892, in the case of *Hymes v Esty (supra).* The rule's ancient origins were emphasized, and the fact that when applied to a market economy, the rule leads to unjust results in favor

of the covenantor (133 NY 342, 347, *supra*). The rule simply violates the general measure of damages where there has been a breach of contract, which is the recovery of foreseeable damages and the value of what has been lost (Measure of Damages for Breach of Covenants of Title in Conveyances or Mortgages of Real Property, Ann., 61 ALR 10, 20-38; 3 Sedgwick, Damages [9th ed], § 951, p 1967). Nonetheless, using the consideration as the measure of damages where there has been a breach of the covenant of seizin, perhaps because of its venerable tradition, apparently remains the law in many, if not most, of the States, including New York (see *Hunt v Hay,* 214 NY 578, *supra*).

The wholesale grafting of the law of covenants of title onto the law of damages with respect to title insurance was questioned, at least implicitly, by former Chief Judge (then Justice) LEHMAN in the case of *Murphy v United States Tit. Guar. Co.* (104 Misc 607, *supra*). Examining both the covenant of seizin and the covenant against encumbrances, Chief Judge LEHMAN stated that the latter "is essentially more nearly like the agreement of a title insurance company" (104 Misc 607, 611, *supra*). Chief Judge LEHMAN pointed out that a title policy goes further than the covenant of seizin in that it concerns unmarketability of title, and, also, like the warranty against encumbrances, is a covenant of indemnity.

We have already seen that the law considers a title policy a contract of indemnity (*Smirlock Realty Corp. v Title Guar. Co.,* 52 NY2d 179, 188, *supra*). As such it differs, as noted by Chief Judge LEHMAN, from the covenant of seizin. Similarly, the printed cover of the policy in question here suggests that the covenant of seizin is not an appropriate model for damages and that the covenant against encumbrances is closer to the mark, confirming Chief Judge LEHMAN's statement. The cover indicates that marketability or the lack of it is an aspect of an insured's loss. Such is not the case where there has been a breach of the covenant of seizin, suggesting that the latter does not provide a valid comparison for measuring loss, inasmuch as it limits recovery to the consideration paid.

A bare two months after *Murphy v United States Tit. Guar. Co.* (104 Misc 607, *supra*) was decided by the Appel-

late Term, First Department, in October, 1918, the Court of Appeals handed down *Empire Dev. Co. v Title Guar. & Trust Co.* (225 NY 53, *supra*). There the court noted that a title insurance policy is akin to a covenant against encumbrances (*Empire Dev. Co. v Title Guar. & Trust Co., supra,* p 61). The court also remarked that it was a contract of indemnity and, then, in determining the meaning of the word "loss", stated that "[f]ailure to keep what a man has or *thinks he has is a loss*" (*Empire Dev. Co. v Title Guar. & Trust Co., supra,* p 59; emphasis supplied). What an owner of real property "thinks he has" will generally be more than the consideration paid. Clearly, the court in the *Empire Dev. Co.* case would have agreed with the view, quoted with approval by the Court of Appeals in *Smirlock Realty Corp. v Title Guar. Co.* (52 NY2d 179, 187, *supra*), that "[a] policy of title insurance means the opinion of the company which issues it, as to the validity of the title, *backed by an agreement to make that opinion good,* in case it should prove to be mistaken" (*First Nat. Bank & Trust Co. v New York Tit. Ins. Co.,* 171 Misc 854, 859; emphasis supplied).

The statements expressed in the preceding paragraph concerning the nature of title insurance seem almost obvious, yet they mark a significant, if unrecognized, departure from the traditional view that compared title insurance, at least in the total loss case, to a covenant of seizin. It follows from *Empire Dev. Co.* (*supra*) and like cases that an insured may recover under the policy for the *loss of what he supposed he had* rather than the consideration he paid (see *Foehrenbach v German-American Tit. & Trust Co.,* 217 Pa 331). Thus, for example, it may be that the insured will be compensated for the loss of profit on a resale of the property, where the loss is readily ascertainable (*Montemarano v Home Tit. Ins. Co.,* 258 NY 478, *supra*). An insured is not limited solely to a theory of recovery based on the fact that he received nothing for what he paid out and, therefore, should only be reimbursed to the extent of his consideration. He can also seek to be placed in the equivalent position which he reasonably thought he occupied in the first place. That is the fundamental or underlying principle of loss in a title insurance case.

The rate manual of the New York Board of Title Underwriters states that an owner's insurance must be in an amount not less than the gross purchase price. In regard of this, James Pedowitz, who is a noted authority on title insurance laws in this State, and who, curiously enough, was formerly chief counsel for defendant, has stated that " '[e]quity insurance' for the purchase price, less mortgages and other liens, is not permitted" (Pedowitz, Title Insurance — What Every New York Lawyer Should Know, 52 NY State Bar J 292, 324). This claim contradicts the position defendant has taken in this case and is consistent with our conclusion. We note that the mere presence in the policy of a maximum being placed on the recovery does not make an insurance contract a valued policy. The determination of loss remains a matter of making the insured whole, up to the amount of the policy.

Applying the fundamental principle of recovery above discussed where there has been a total loss of title, the measure of loss will generally be the market value of the property within the limit of the policy (Measure, Extent, or Amount of Recovery on Policy of Title Insurance, Ann., 60 ALR2d 972, 977; 15A Couch, Insurance [2d ed], § 57:182). While the purchase price certainly may be a factor in determining value, it should not be considered necessarily dispositive (see *Hartman v Shambaugh,* 96 NM 359). The value may be considerably greater than the purchase price. On the other hand, where the actual value is less than the purchase price, the insured is entitled to the latter amount as compensation for a total breach of the warranty of title, that being his out-of-pocket injury (*Dallas Tit. & Guar. Co. v Valdes,* 445 SW2d 26 [Tex]; 15A Couch, Insurance [2d ed], § 57:182).

Where there is a partial loss of title and where the partial loss cannot readily be rectified, such as where an encumbrance cannot be removed, the standard ordinarily will be, as set forth in *Glyn* (132 App Div 859, *supra*), the value of the property without the defect in title less its value with the defect (15A Couch, Insurance [2d ed], § 57:184; 9 Appleman, Insurance Law & Prac [rev vol], § 5216, p 102). In essence, the formula in the total loss case is but an application of this formula, wherein it is assumed

that the value of the property with the defect is zero, the defect being total.

We would be remiss if we did not again examine the *Grimsey* case (38 AD2d 572, 573, *supra*), relied on by defendant, wherein we stated that the plaintiff insured could not recover the value of the fee. This language does hearken back to the days when title insurance was likened to a covenant of seizin (cf. *Matter of Boylan,* 119 Misc 545, 547 [holding that the measure of damages for the breach of a covenant of seizin is the purchase price, less the amount owed on a purchase-money mortgage]). To that extent *Grimsey* should not be considered as a valid statement of the law. However, we note that *Grimsey,* nonetheless, reached the correct result. The record in that case reveals that the actual value of the property at issue was apparently less than the plaintiff's $25,000 down payment. Therefore, the plaintiff was entitled to his consideration, representing his out-of-pocket loss (*Dallas Tit. & Guar. Co. v Valdes,* 445 SW2d 26 [Tex], *supra*).

Returning to the case at bar, we conclude that the trial court utilized the correct standard for determining plaintiff's loss, that is, the diminution in the value of the property caused by the denial of access via St. George Place and Jeanette Avenue.

*Improvements and Date of Loss*

According to the trial court, the parties disagreed about the date upon which the value of the property was to be determined; the defendant opted for May 14, 1969, the date of closing, while the plaintiff argued for a later date. The court avoided resolving this question, finding that the real question was whether the improvements made by plaintiff to the property should be taken into account. It found that they should be.

We disagree with the trial court's view of the record. In unequivocal terms, plaintiff's attorney agreed with the May 14 date, with the proviso that the improvements made within six weeks of the closing should be taken into account. Thus, both sides, for differing reasons, agree, at least for the purposes of this case, on the date. They disagree on the matter of the improvements.

The trial court maintained that solving the question of the improvements obviated the need to address the issue of the appropriate date for valuation. As already noted, in fact both sides indicated at trial their willingness to use May 14, 1969, as the appropriate date. However, we agree with the trial court that the general question of when loss should be computed in a case involving a title policy is a matter inextricably intertwined with whether or not improvements made to a property after closing are considered part of the insured's loss or damage.

In *Glyn* (132 App Div 859, *supra*) the court stated that the diminution in value should be measured as of the date when the property was purchased. That is the general rule where there has been a breach of a covenant of title, under the theory that the breach occurred when the covenant was made (see *Hunt v Hay,* 214 NY 578, 583, *supra; Staats v Executors of Ten Eyck,* 3 Caines 111). However, more recent cases have gone contrary to *Glyn* in this respect (see, e.g., *Overholtzer v Northern Counties Tit. Ins. Co.,* 116 Cal App 2d 113), making the question of date another matter of controversy in the law of title insurance (15A Couch, Insurance [2d ed], § 57:186).

The majority of jurisdictions appears to follow the view of the court in *Overholtzer (supra)* that an insured's loss is to be measured from the date that he discovers the defect (see, e.g., *Hartman v Shambaugh,* 96 NM 359, *supra*). There is much to be said for this position. In the words of the court in *Overholtzer* (116 Cal App 2d 113, 130, *supra*): "When a purchaser buys property and buys title insurance, he is buying protection against defects in title to the property. He is trying to protect himself then and for the future against loss if the title is defective. The policy necessarily looks to the future. It speaks of the future. The present policy is against loss the insured 'shall sustain' by reason of a defect in title. The insured, when he purchases the policy, does not then know that the title is defective. But later, after he has improved the property, he discovers the defect. Obviously, up to the face amount of the policy, he should be reimbursed for the loss he suffered in reliance on the policy, and that includes the diminution in value of the property as it then exists, in this case with improve-

ments. Any other rule would not give the insured the protection for which he bargained and for which he paid".

Whether the date of discovery or some other date should be considered the measuring date is an issue which, while extremely important, need not be resolved here for reasons which will become clear.

Initially, we note that we are not constrained to follow the rule as to the proper date found in *Glyn* (132 App Div 859, *supra*). That is important, because the clear implication of using the date of purchase as the measuring date is that improvements made subsequent to purchase should be precluded in evaluating loss. The court in the *Glyn* case did not elaborate on its reasons for using the date of purchase as the loss valuation date, and this omission alone gives us pause. Moreover, we will not, as already seen, arbitrarily carry over into the title insurance context the ancient rules governing covenants of title. Finally, and most important, the decision in *Glyn* does not contain any relevant portions of the title policy there at issue, and therefore, we really cannot evaluate the viability of that case as to the appropriate measuring date for valuation. On the other hand, the policy before us now does contain, in our view, certain relevant provisions.

We note, as did the court in *Overholtzer* (116 Cal App 2d 113, *supra*), that the plaintiff's policy refers to "all loss or damage * * * which the insured *shall sustain*" (emphasis supplied). Such language certainly looks to the future, past the date of closing. We also find section 6 of the conditions of the policy, one of its 12 conditions, to be highly significant. In pertinent part it reads as follows:

"Section 6 COINSURANCE AND APPORTIONMENT

"(a) In the event that a partial loss occurs after the insured makes an improvement subsequent to the date of this policy, and only in that event, the insured becomes a coinsurer to the extent hereinafter set forth.

"If the cost of the improvement exceeds twenty per centum of the amount of this policy, such proportion only of any partial loss established shall be borne by the company as one hundred twenty per centum of the amount of this policy bears to the sum of the amount of this policy and the

amount expended for the improvement. The foregoing provisions shall not apply to costs and attorney's fees incurred by the company in prosecuting or providing for the defense of actions or proceedings in behalf of the insured pursuant to the terms of this policy or to costs imposed on the insured in such actions or proceedings, and shall apply only to that portion of losses which exceed in the aggregate ten per cent of the face of the policy.

"Provided, however, that the foregoing coinsurance provisions shall not apply to any loss arising out of a lien or incumbrance for a liquidated amount which existed on the date of this policy and was not shown in Schedule B; and provided further, such coinsurance provisions shall not apply to any loss if, at the time of the occurrence of such loss, the then value of the premises, as so improved, does not exceed one hundred twenty per centum of the amount of this policy".

It is defendant's position that the coinsurance provision, that is, section 6 of the policy conditions, is not relevant here because the value of the claimed improvements, $95,000, does not exceed 20% of the $600,000 amount of the policy. While it is true that plaintiff is not a coinsurer, that is so simply because section 6 *is relevant* and under that section the insured can only be a coinsurer if he improves the property over a certain amount. We find section 6 to be pertinent to whether improvements should be considered in this case for several reasons.

First, throughout the above-quoted portion of section 6, reference is made to the "occurrence" of a partial loss and when it happened. This makes no sense if the loss is always deemed to have occurred at the time of closing. Rather, the provision (and therefore the contract) anticipates a date after the closing on which, somehow, it is determined that a loss occurred.

Second, the very fact that section 6 describes a formula for loss which takes into account improvements made subsequent to closing suggests both that improvements are generally to be taken into account in the determination of value, and that a date subsequent to the closing is the relevant measuring time for valuation. In opposition to this, defendant maintains that, according to the rate man-

ual filed with the Superintendent of Insurance, improvements can only be considered where the insured pays an additional premium to cover improvements, which plaintiff admittedly did not do. We disagree.

Defendant has not pointed to any provision of either the rate manual or the policy which says that improvements cannot be compensated as loss under a title insurance policy unless an additional premium is paid. It certainly is the case that the rate manual allows for additional protection for improvements. However, the coinsurance provision of the policy, section 6, is designed for just those situations where an insured either does not purchase such additional coverage or where the actual improvements exceed the improvements contemplated when the insured did pay an additional premium. Logically, this would follow from the mere fact that an insured paying an additional premium for improvements would naturally contemplate that he would not become a coinsurer. It is also demonstrated by the last clause in subdivision (a) of section 6, which is as follows: "such coinsurance provisions shall not apply to any loss if, at the time of the occurrence of such loss, *the then value of the premises, as so improved, does not exceed one hundred twenty per centum of the amount of this policy*" (emphasis supplied). According to the provision in the rate manual to which defendant has called attention, when an additional premium is paid for improvements, the minimum amount of the policy is the purchase price plus the cost of the contemplated improvements. Clearly, it will often and, perhaps, usually be the case that the value of the premises, as improved, will not exceed 120% of the amount of the policy, where the amount of the policy is the purchase price plus the cost of improvements. In effect, then, the payment of the additional premium for improvements will generally prevent the insured from ever being a coinsurer.

Third, having concluded that the coinsurance section is generally meant to apply to insureds who do not pay an additional premium for improvements, we are bemused by defendant's contention that improvements are not to be considered in determining value. The coinsurance formula is intended to prevent the insurance company from having

to bear 100% of a partial loss, where the value of what has been lost has increased, at least in part, because of substantial improvements made after the policy date. In essence, the policy contemplates reasonable and normal improvements of up to 20% of the amount of the policy. Anything over that results in the company bearing a diminishing percentage of responsibility.

To illustrate, suppose that the policy amount is $100,000 and there are improvements costing $50,000. The company would then be obligated to pay only 80% of the loss according to the coinsurance formula. Now, suppose that the value of the loss, due to a defect in title, not taking into account the improvements, is $50,000, while it is $75,000 when the improvements are taken into account. Following defendant's argument, the company would have to pay only 80% of $50,000 or $40,000; less than what would have to be paid if no improvements were made at all! On the other hand, if improvements are to be taken into account, the $75,000 figure would be correct, but the company would have to pay only 80% of it or $60,000. The latter result is what is contemplated by the coinsurance formula.

Where the cost of improvements exceeds 20% of the amount of the policy, the coinsurance formula is operable. Under these circumstances, computations of the extent of the loss must take into account the improvements. There is nothing in the agreement which would indicate that, where the coinsurance formula is not in effect because the improvements cost less than 20% of the policy, improvements should be ignored for valuation purposes. We can perceive no reason for such being the case. Clearly, any additional costs to the insurer can be offset and undoubtedly are offset by factoring into the premium amount an allowance which takes into account the likelihood of improvements being made at a cost of less than 20% of the policy.

We thus conclude that the improvements are to be taken into account in measuring plaintiff's loss under the title policy without any need for the payment of an additional premium. It follows from this, as is suggested by the provisions of the policy discussed above, that the date of sale should be generally not be considered the date on

which the diminution of value is measured. The title policy, indeed, looks to the future.

The coinsurance section seems to suggest that the date of valuation is the date on which a loss actually occurred. That is not necessarily the same as the date the defect was discovered, as the facts in this case illustrate. The defect here was discovered on or about November 1, 1971, when St. George Place and Jeanette Avenue were torn up. Yet, plaintiff suffered no real loss until Pan Am stopped paying its rent, which occurred on April 14, 1972. Thus, the latter date might be the appropriate one for valuation purposes.

We need not, however, resolve the question of date because both parties were willing to accept May 14, 1969, the date of the sale, as the appropriate date. This concession was made by plaintiff, provided that the subsequent improvements were to be taken into account. Since, without the concession of May 14, 1969, as the measuring date, plaintiff would certainly be allowed to prove its loss taking into account the improvements, we see no reason to preclude the utilization of the improvements just because plaintiff was willing to accept that date for valuation purposes.

*Expert Testimony*

Since the improvements to the warehouse property could properly be taken into account, the testimony of plaintiff's appraiser is not subject to attack solely because he took into account the lease to Pan Am or evaluated the worth of the property as improved. On the other hand, the $75,000 deduction made by defendant's expert witness, representing his estimate of the cost to put the property into good condition, was inappropriate. Thus, the figures arrived at by the experts for the value of the property, as improved, with adequate access by large trucks, were $867,500 and $725,000, respectively.

While defendant maintains on appeal that it continues to stand by the valuation made by its expert, it has not set forth any arguments questioning the conclusion of the trial court that the property, without the defect in title, was worth $800,000, nor has it criticized any aspect of the income capitalization analysis made by plaintiff's ap-

praiser. Plaintiff, according to its brief on appeal, is willing to accept the trial court's finding.

■ In our view, since this was commercial income-producing property, both experts correctly relied primarily on the capitalization of income approach to valuation (*Onondaga Sav. Bank v Cale Dev. Co.*, 63 AD2d 415 [SIMONS, J.]). They both were quite right to virtually ignore the 1969 selling price, since that sale was made under the stress of a pending foreclosure (*Matter of 860 Fifth Ave. Corp. v Tax Comm. of City of N. Y.*, 8 NY2d 29, 31). It would have been preferable for the trial court to have explained how it derived a capitalization rate of 9.6% and a final figure of $800,000 (*Shore Haven Apts. No. 6 v Commissioner of Fin. of City of N. Y.*, 93 AD2d 233, 236). However, because the trial court's findings fall within the range of the expert testimony and because neither side has given us any reason to question them, we conclude that it correctly determined the value of the property with access.

Defendant does maintain that the trial court erred in concluding that the property without access via St. George Place and Jeanette Avenue was worth only $200,000. It is argued that the sale to U-Haul cannot be used as a comparable because it occurred eight years after the date of valuation. Further, the testimony of plaintiff's engineer and the appraiser, as to value based on what it would take to cure the situation, allowing for access by way of Carvel Place, is, according to defendant, "fantastic and unrealistic", because the "premises are being used today without any of this work being performed".

We need not address ourselves to the question of whether the price of the U-Haul sale could establish the value of the property in 1969, as the trial court itself found this method untrustworthy, and, instead, apparently relied on the cost-to-cure approach. In fact, it appears that plaintiff's appraiser only used the U-Haul sale as a check on the conclusion reached by the income capitalization method. We disagree with defendant's contention that the testimony of the engineer and plaintiff's appraiser is unbelievable. It certainly is the case that large trucks cannot now, after the elimination of St. George Place and Jeanette Avenue, approach the warehouse. Defendant has given us

no reason to doubt the conclusion of plaintiff's expert that the best and most valuable way to use the property is with the constant use of large tractor trailers. The current usage of the property by U-Haul is necessarily limited in scope and hardly is a reason for believing that the property can be used as productively now as it was in 1969.

For his analysis based on the cost-to-cure approach, plaintiff's appraiser used income capitalization. He found that because of the necessary reconfiguration of the building, wherein the loading docks would be moved to the front to give access to Carvel Place while the offices would be placed in the back, the property would not yield as high an income as it did when access was from St. George Place and Jeanette Avenue. Defendant has not maintained to the contrary, nor has it contradicted the net income figure arrived at by the plaintiff's appraiser. Therefore, in the absence of any alternative figures to consider, we accept the plaintiff's appraiser's finding that the annual gross potential rent of the property after reconstruction would be $90,100, leading, after various computations and deducting the cost to reconstruct, to a net capitalized value of $206,150.

The trial court found the value without access to be $200,000. Since plaintiff's own expert has stated that the value of the property without access was $206,150, we see no reason to reduce this figure to defendant's detriment. We thus conclude that the value of the property on May 14, 1969, with access via St. George Place and Jeanette Avenue was $800,000, and that without access the value was $206,150, the difference being $593,850.

*Subrogation to the Mortgagee's Interest*

The primary contention on plaintiff's appeal is that defendant should not be entitled to subrogation except, possibly, to the extent of the $32,500 it paid to the bank. Section 8 of the conditions of both plaintiff's and the bank's respective title policies, entitled "SUBROGATION", states in relevant part that: "This company shall to the extent of any payment by it of loss under this policy, be subrogated to all rights of the insured with respect thereto. The insured shall execute such instruments as may be requested to transfer such rights to this company. The rights

so transferred shall be subordinate to any remaining interest of the insured". Relying on this section, the trial court held that defendant was entitled to subrogation. It determined the amount to be set off at $335,000, being the difference between the amount of the mortgage title policy and the value of the land without access by large trucks.

■ Plaintiff maintains, for the first time on appeal, that defendant waived its right to a setoff through subrogation by failing to plead it in its answer and by failing to move to amend its answer. However, this court may, *sua sponte,* relieve defendant of its failure to amend its pleadings by deeming the answer amended to conform to the evidence at trial, absent a showing of prejudice to plaintiff (CPLR 3025, subd [c]; *Harbor Assoc. v Asheroff,* 35 AD2d 667, 668; see, also, *Pace v Perk,* 81 AD2d 444, 462-463). When defendant submitted evidence at trial that the bank had made a claim against it and that there was a settlement of that claim, plaintiff made no objection. Plaintiff was also presumably aware of the subrogation clause in the form title policy, and therefore must have been aware of defendant's purpose in presenting evidence of the settlement with the bank. Even in its argument on appeal plaintiff has not asserted that it was prejudiced by the failure to plead a setoff. Accordingly, we find that there was no prejudice, and defendant's answer should be considered amended.

It is well settled that where a mortgagee has a separate insurance policy protecting it, the insurer, on making compensation, may be subrogated as against the owner mortgagor (*Fields v Western Millers Mut. Fire Ins. Co.,* 290 NY 209, 214). Excepting the alleged need to amend the pleadings to reflect the right of subrogation, plaintiff has not given any reason to question the application of that right to this case. Plaintiff's point is well taken, however, that defendant's right of subrogation should be limited to the amount it expended in settling the bank's claim. The subrogation clause itself contains such a limitation. That provision in the contract conforms with the general rule that a subrogee is only entitled to the amount actually paid by him (*Broad Exch. Assoc. v Hirsch & Co.,* 51 AD2d 896; 57 NY Jur, Subrogation, § 27).

The trial court, as well as the defendant, was apparently of the view that to limit the offset to the actual payment made to the mortgagee would give the plaintiff a huge windfall which could not possibly be the intent of its title policy. We are sympathetic to the court's concern. However, the subrogation clause as it is written is satisfactorily designed to prevent just such a windfall. With its presence, the title company is not vulnerable to a cumulative or double recovery, equivalent to the total amounts of both title policies (see *Scinta v Kazmierczak,* 59 AD2d 313, 316). It is as though, in the case where only one policy might be issued, there is a provision in the policy allowing for a *pro tanto* reduction in what is owed the homeowner resulting from a payment made to the homeowner's mortgagee (see *Grady v Utica Mut. Ins. Co.,* 69 AD2d 668, 673-674).

The record does not contain any instruments which purportedly assign the bank's mortgage to defendant, but, presumably, if such exist, they constitute, at most, a partial assignment, reflective of the $32,500 payment. This is evidenced by the small size of the settlement between the bank and the title company. It is also evidenced by the formula for determining the loss under a mortgage title policy, which is the difference in the market value of the mortgage on the property without the title defect and its value with the defect (5A Warren's Weed, NY Real Property [4th ed], Title Insurance, § 2.06). The amount of loss derived from this formula is clearly less than the amount owed on the mortgage itself.

As section 8 of the conditions of the policy states, rights transferred pursuant to subrogation shall be subordinate to "any remaining interest of the insured [mortgagee]". Resulting in only a partial assignment, the payment of compensation by the insurer to the mortgagee did not eradicate the latter's rights, if any, to seek a deficiency judgment after the foreclosure sale (see *Dollar Fed. Sav. & Loan Assn. v Herbert Kallen, Inc.,* 66 AD2d 793). If it appears that plaintiff is getting more than it should, because the offset should only be $32,500, this has nothing to do with the title company. Rather, it is a result of the record's silence as to whether the bank obtained a deficiency judgment against the plaintiff. Assuming the bank

never obtained a deficiency judgment, defendant cannot use that fact to somehow increase that to which it is subrogated as though it were the one entitled to recover the deficiency. If the bank did obtain a deficiency judgment pursuant to RPAPL 1371 and has not, up until now, collected on it, presumably, on satisfaction of the judgment to be issued herein, it could have execution.

Defendant's right of subrogation impinges on another issue in this case, already discussed, which is whether or not the measure of loss is plaintiff's equity in the property. Assume that there was a complete loss of title. According to defendant, plaintiff would be entitled, at most, to $65,000, under its title policy. Defendant would, very likely, be subject to a claim from the mortgagee for the full $535,000 of the mortgage title policy. With subrogation, plaintiff would owe defendant the $535,000, the bottom line being that defendant would only be out $65,000 on both policies together, the same as though it had only issued a fee policy. In effect, defendant would be receiving the benefit of two subrogations, one on the mortgage policy, the other a hidden subrogation right in the fee title policy allowing for a *pro tanto* reduction in the fee holder's benefit corresponding to what is owed the mortgagee. With such a scheme, the title company would be the one receiving a double or cumulative benefit, with the fee holder getting less than nothing. Such could hardly be the intent of parties entering into a contract of title insurance!

### Other Consequential Damages

Insofar as the inverse condemnation proceeding contested the vesting of title in the Town of Hempstead to the roadbeds of St. George Place and Jeanette Avenue, the trial court properly found that plaintiff was entitled to be reimbursed for the $1,500 in counsel fees paid by it (see *Grimsey v Lawyers Tit. Ins. Corp.*, 31 NY2d 953, *supra*). Furthermore, plaintiff is entitled to be compensated for any and all expenses naturally and proximately caused by the defect in title (15A Couch, Insurance [2d ed], § 57:187). This includes, besides the loss in value to the property already discussed, all damages proximately caused by a failure to remedy a title defect (9 Appleman, Insurance Law & Prac [rev vol], § 5216, p 104). Plaintiff seeks to

include within this category the maintenance expenses incurred during the years 1972 through 1974. In opposition, defendant argues that the tax returns used to prove these expenses "were incomplete, constituted hearsay[,] were in pencil and were not signed by anyone".

Copies of the tax returns filed by plaintiff with the Internal Revenue Service were admitted in evidence, after an adequate foundation had been laid, under the business record exception to the hearsay rule. As such, any objection went to weight, not admissibility. We note that the trial court did not accept many of the expenses listed in the returns. On this appeal plaintiff has not objected to the trial court's conclusion that its expenses came to a total of $20,177. We find that this figure is not against the weight of the evidence.

Defendant also argues that the only maintenance costs which should be allowed are those expended during the life of the triparty agreement which was signed on August 15, 1973 and pursuant to which the bank was to forbear on foreclosure "pending the determination of [the] appeal [in the inverse condemnation proceeding] or to April 1, 1974, whichever is later". This argument ignores the fact that, around Christmas of 1971, plaintiff and defendant reached an accord concerning the inverse condemnation proceeding, whereby plaintiff was to continue to maintain the property. That proceeding was pending by early 1972 and did not officially end until the Court of Appeals denied leave to appeal on November 15, 1974. The trial court's finding that this litigation was instigated at defendant's request is amply supported by the record. Thus, defendant is liable for the reasonable maintenance expenses from 1972 up to November 15, 1974. As seen by the judgment and the fact that the trial court awarded interest on the 1974 expenses "from November 15, 1974", the trial court, quite properly, did not award compensation for expenditures past that date. We thus affirm the court's award of $20,177 for maintenance costs.

Plaintiff seeks to relitigate the award on defendant's counterclaim, which was not disturbed by the Court of Appeals. It argues that, in actual fact, the Court of Appeals did not approve the award in defendant's favor, since it

stated that "amounts owing under this counterclaim must await a determination of the amount due plaintiff as damages under its title policy" (*Smirlock Realty Corp. v Title Guar. Co.*, 52 NY2d 179, 191, *supra*). Plaintiff maintains that the expenses defendant incurred during the inverse condemnation proceeding, amounting in the main to the payment of taxes, were properly defendant's responsibility.

We disagree. The quotation from the court's decision found in plaintiff's brief was taken out of context. The full quote is as follows: "Pursuant to that [triparty] agreement, plaintiff was to repay defendant the amounts so advanced subject to a setoff of any sums found due to plaintiff under its title policy. Inasmuch as plaintiff offers no basis for overturning the judgment rendered in defendant's behalf on this counterclaim, we do not disturb that award. Of course, payment of the amounts owing under this counterclaim must await a determination of the amount due plaintiff as damages under its title policy" (*Smirlock Realty Corp. v Title Guar. Co.*, 52 NY2d 179, 191, *supra*). Thus, not only is it clear that the Court of Appeals affirmed so much of the order of this court as affirmed the portion of the judgment entered on the defendant's counterclaim, but the Court of Appeals explained that the triparty agreement itself contained a provision allowing for such indemnification.

As we have already seen, the diminution in the value of the property comes to $593,850. With compensation for counsel fees and maintenance expenses, the total is over $600,000, the amount of the policy. Hence, it might be suggested that the counsel fees and maintenance expenses be reduced to $6,150, to bring the total to an even $600,000. However, the face amount of a title policy does not serve as a limit with respect to damages reasonably incurred in litigating a claim of title (*Grimsey v Lawyers Tit. Ins. Corp.*, 38 AD2d 572, mod on other grounds 31 NY2d 953, *supra;* 15A Couch, Insurance [2d ed], § 57:174). Such damages may be recovered without regard to a provision limiting liability to the face amount of the policy. In our view, damages of this nature need not be limited to attorney's fees. Were it not for the attempt to clear the title

in the inverse condemnation proceeding, an attempt made at defendant's behest, plaintiff might not have continued to maintain the property as it did. We thus do not limit the total award to the face amount of the policy.

*Interest*

■ The last issue to be resolved concerns interest. Plaintiff contends that interest on the award for the loss in value of the property should run from May 14, 1969, the date of sale. Defendant argues that no interest should be allowed, since the sum due was unliquidated. The trial court held, as stated above, that interest should run from the date of the decision in the inverse condemnation proceeding. We disagree with all three viewpoints.

The out-of-State cases cited by defendant are distinguishable in that they are based on statutes in other jurisdictions which limit prejudgment interest to cases involving liquidated sums (see, e.g., *Overholtzer v Northern Counties Tit. Ins. Co.,* 116 Cal App 2d 113, *supra*). The applicable statute here is CPLR 5001 which states as follows:

"Interest to verdict, report or decision

"(a) Actions in which recoverable. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

"(b) Date from which computed. Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

"(c) Specifying date; computing interest. The date from which interest is to be computed shall be specified in the verdict, report or decision. If a jury is discharged without

specifying the date, the court upon motion shall fix the date, except that where the date is certain and not in dispute, the date may be fixed by the clerk of the court upon affidavit. The amount of interest shall be computed by the clerk of the court, to the date the verdict was rendered or the report or decision was made, and included in the total sum awarded."

The key provision is the first sentence in CPLR 5001 (subd [b]). The first clause of that sentence supports plaintiff's position, since plaintiff's cause of action, at least theoretically, existed at the very time it purchased the property. However, the second clause states: "except that interest upon damages incurred thereafter shall be computed from the date incurred". As discussed, *supra,* plaintiff did not suffer any damage or loss as a result of the defect in title until after Pan Am made its last rent payment. Thus, interest on the sum representing the loss in value of the property should be computed from that date, namely April 14, 1972.

The date of the decision in the inverse condemnation proceeding is not significant for the purpose of fixing the date for the accrual of interest. Contrary to the view of the trial court, plaintiff's loss was not theoretical up until that date; it was real. True, if that litigation had gone in plaintiff's favor, much of the loss would have been recouped. However, the access streets had been dug up by late 1971, and after April 14, 1972, the property, instead of producing income, became nothing more than an expensive liability to plaintiff. We also note that if interest were to commence running only after litigation to clear title had been lost, the title company would be the one controlling the interest accrual date. The insured's right to interest should not be subject to the insurer's decision, however well motivated, to seek to litigate a claim of title.

## CONCLUSION

The judgment dated May 4, 1982 should be modified in accordance with this decision. Plaintiff is entitled to the sum of $593,850, with interest from April 14, 1972, representing the diminution in the value of the property caused by the defect in title. Plaintiff is also entitled to compensation for counsel fees and maintenance expenditures, in the

amounts and with interest from the dates as set forth in the judgment. Defendant is entitled to a setoff in the amount of $32,500, with interest from November 13, 1978, arising from its right of subrogation. Accordingly, the matter should be remitted to the Supreme Court, Nassau County, for the entry of such a modified judgment. The order dated May 20, 1982, and the judgment dated June 1, 1982, should be affirmed. Plaintiff should be awarded one bill of costs.

LAZER, J. P., THOMPSON and WEINSTEIN, JJ., concur.

Judgment dated May 4, 1982 modified, on the law, by deleting therefrom the words "the sum of $265,000, with interest from Feb. 22, 1973" and substituting therefor the words "the sum of $593,850, with interest from April 14, 1972", by deleting therefrom the words "the interest on said sums amounting to $165,831.40", and by adding thereto a provision awarding defendant a setoff in the amount of $32,500, with interest from November 13, 1978. As so modified, judgment dated May 4, 1982, affirmed insofar as appealed from, and matter remitted to the Supreme Court, Nassau County, for the entry of an appropriate amended judgment in accordance herewith.

Order dated May 20, 1982 affirmed.

Judgment dated June 1, 1982 affirmed.

Plaintiff is awarded one bill of costs.