OPINION OF THE COURT
Jasen, J.
This appeal presents a question of first impression for our court. At issue is whether a policy of title insurance will be rendered void pursuant to a standard misrepresentation clause found therein as a result of the insured’s failure to disclose a material fact which was a matter of public record at the time the policy was issued.
In.November, 1967, the Town of Hempstead condemned and thereby acquired title to certain property on and adjacent to the premises known as 31-39 Carvel Place, which is located in Inwood, Long Island. At that time, the premises were owned by Bass Rock Holding, Inc. (Bass Rock), a *183 corporation controlled by Helen and Anthony De Giulio. The Bass Rock property was improved by a warehouse and access to and from the property was over three public streets: Carvel Place to the north of the premises and St. George Street and Jeanette Avenue to its east. The principal loading docks for the warehouse were located at the easterly end of the building with direct access from St. George Street and Jeanette Avenue. In addition, there was an alleyway along the northern side of the warehouse connecting the Carvel Place entrance to these loading docks. However, clearance along this passageway was quite limited and trucks would often strike the warehouse building when attempting to maneuver down this alleyway. Because of this, the Carvel Street entrance was of little value as an access route for the warehouse facility.
The Bass Rock property was heavily indebted and in 1968 there was a default in mortgage payments. A foreclosure proceeding was instituted in the early part of 1969. It was at about this time that Gerald Tucker, general counsel for one of the mortgagees in the foreclosure proceeding, indicated an interest in the property and negotiations were commenced with the De Giulios with a view toward the eventual purchase of the Bass Rock property. Soon thereafter, the plaintiff corporation was formed by Tucker and a group of associated investors.
It was also around this time, according to the testimony of Abraham Lee, Special Counsel for the Town of Hemp-stead, that Lee telephoned Tucker to inform him that a portion of the Bass Rock property had been condemned by the town and should be excluded from the foreclosure proceeding. Lee testified that he identified the condemned parcel as “abutting on Carvel Place”, but that Tucker stated that he was not interested and would proceed with the foreclosure action anyway. The parcel in question subsequently was identified in the record as the town’s damage parcel 8-6, taken for street alignment purposes.
Sometime after Tucker spoke with Lee, Tucker and Joseph Tiefenbrun, the attorney retained by plaintiff, met with the Bass Rock attorney to discuss the details of the sales contract. At this meeting, Tucker was informed that, *184 although the exact location of the property involved was uncertain, Bass Rock was entitled to a $5,000 to $6,000 condemnation award from the Town of Hempstead. As a result of this discussion, the contract was amended to include a clause assigning “any condemnation award affecting the premises then due or to be due in the future” to the plaintiff. It was agreed that the necessary information concerning this condemnation wduld be provided at the title closing. On April 25, 1969, the sales contract was executed by Bass Rock and the plaintiff. The purchase price was set at $600,000.
On May 14, 1969, title was closed. During the closing, and in the presence of defendant’s title closer, Tucker and Mrs. De Giulio discussed the condemnation award referred to in the sales contract. In fact, Mrs. De Giulio sketched an outline of the condemned property on the Bass Rock title survey. The parcel marked by Mrs. De Giulio was adjacent to the southwest corner of the Bass Rock property, but it was not part of nor did it affect any access routes to the warehouse.
After title closed, defendant issued plaintiff a title policy covering the warehouse property. The policy contained the following clause insuring access to public streets: “Notwithstanding any provisions in this paragraph to the contrary, this policy, unless otherwise excepted, insures the ordinary rights of access and egress belonging to abutting owners.” It should be noted that no exception was listed in the policy for any condemnation affecting Carvel Place, St. George Street or Jeanette Avenue.
At the time the property was purchased, plaintiff leased the entire premises to Pan American World Airways, Inc. In addition, plaintiff had spent an additional $95,000 above the purchase price in order to improve the premises for its new tenant. Unfortunately, it was soon discovered that the title search had failed to reveal that the roadbeds of St. George Street and Jeanette Avenue and a portion of the property along Carvel Place had been condemned by the Town of Hempstead two years prior to plaintiff’s acquisition of the property. It was apparent that the defendant’s title searchers simply failed to check the master card on *185 file at the Nassau County Clerk’s office covering the applicable section and block which would have revealed these condemnations.
By 1971, plans for urban development in the Town of Hempstead required the closing down of the warehouse access'routes at St. George Street and Jeanette Avenue, thereby rendering the property valueless. As a result, Pan American quit the premises and plaintiff eventually lost 31-39 Carvel Place in a foreclosure sale. Plaintiff then commenced the present action against the defendant seeking to recover $600,000 in damages pursuant to its title insurance policy based on the defendant’s failure to discover the condemned roadbed property.*
In its answer, defendant pleaded an affirmative defense based on the following standard provision in its policy:
“MISREPRESENTATION
“Any untrue statement made by the insured, with respect to any material fact, or any suppression of or failure to disclose any material fact, or any untrue answer by the insured, to material inquiries before the issuance of this policy, shall void this policy.”
According to defendant, plaintiff, through its agent Tucker, had knowledge prior to the closing of the town’s condemnation as a result of his conversation with Lee. Defendant asserted that plaintiff’s failure to divulge this knowledge to the defendant was a “failure to disclose [a] material fact” which rendered the title policy void.
At the end of a nonjury trial, Trial Term dismissed plaintiff’s claim. Finding that plaintiff, through Tucker, had knowledge of the condemnations prior to the issuance of the policy which it failed to disclose to the defendant, Trial Term concluded that the policy was nullified.
On appeal, a unanimous Appellate Division affirmed, but *186 for reasons somewhat different than those expressed at Trial Term. The Appellate Division determined that although Tucker had been alerted by Lee as to the taking along Carvel Place of damage parcel 8-6, this fact offered no basis for the further inference, one apparently drawn by Trial Term, that Tucker also had knowledge of the condemnation of the roadbeds at St. George Street and Jeanette Avenue. Thus, the Appellate Division found that Tucker only had knowledge prior to the closing of the Carvel Place taking and of the condemnation of the small adjacent parcel at the southwest corner of the property which was identified at the closing by Mrs. De Giulio. According to the Appellate Division, the crucial issue of the case was whether “this knowledge concerned a material fact, the concealment of which was tantamount to a misrepresentation sufficient to permit defendant to void its title policy” (70 AD2d, at p 461).
In addressing this issue, the court below defined materiality in terms of “whether the suppression deprived the insurer of its freedom of choice in determining whether to accept or reject the risk upon full disclosure of all the facts which might reasonably affect that choice.” (70 AD2d, at p 462.) The court went on to state (at p 463) that materiality “extends to any information that might have been revealed had further inquiry followed the initial disclosure of the suppressed facts.” The court found that information regarding the condemnation of damage parcel 8-6 at Carvel Place was not itself material in that that taking had little, if any, effect on the value of the property. However, because disclosure of the Carvel Place taking, revealed to Tucker prior to closing, would have caused the defendant to check the appropriate public records and inevitably led to the discovery of the St. George Street and Jeanette Avenue condemnations, the Appellate Division concluded (70 AD2d, at p 463) that “no title insurance company with knowledge of [these] facts would have insured ingress and egress over streets already condemned for an urban renewal project.” Therefore, inasmuch as Tucker’s failure to disclose the information acquired in his conversation with Lee deprived the defendant of its “freedom of choice in de *187 termining the nature, scope and extent of the risk it would assume”, the Appellate Division held (at p 464) that the suppression of the information regarding the Carvel Place condemnation was “material as a matter of law and would preclude recovery on the policy”. We reverse.
At the outset, we note our agreement with the court below that information concerning the condemnations of damage parcel 8-6 adjacent to Carvel Place and the St. George Street and Jeanette Avenue roadbeds was material. It is manifest that revelation of this information certainly would have affected defendant’s choice of insuring the risk covered by the policy issued to plaintiff. (See Vander Veer v Continental Cas. Co., 34 NY2d 50; Geer v Union Mut. Life Ins. Co., 273 NY 261; Travelers Ins. Co. v Pomerantz, 246 NY 63; see, generally, 5A Warren’s Weed New York Real Property, Title Insurance, § 2.08.) However, contrary to the view expressed by the Appellate Division, the mere existence of knowledge of a material fact on plaintiff’s part does not end the analysis. Rather, in order to ascertain whether the policy has been voided, a further determination must be made as to whether plaintiff was under a duty to disclose this information to defendant. (Geer v Union Mut. Life Ins. Co., 273 NY 261, supra; Sebring v Fidelity-Phenix Fire Ins. Co. of N. Y., 255 NY 382.) In order to make that determination,' we first must examine the nature of the agreement entered into by the parties and the respective expectations and obligations of the insured and insurer which arise out of a policy of title insurance.
By definition, title insurance involves “insuring the owners of real property * * * against loss by reason of defective titles and encumbrances thereon and insuring the correctness of searches for all instruments, liens or charges affecting the title to such property”. (Insurance Law, § 46, subd 18; see, also, § 438.) Or, as one lower court has expressed it, “[a] policy of title insurance means the opinion of the company which issues it, as to the validity of the title, backed by an agreement to make that opinion good, in case it should prove to be mistaken, and loss should result in consequence to the insured.” (First Nat. Bank & Trust Co. of Port Chester v New York Tit. Ins. Co., 171 Misc 854, *188 859.) Essentially, therefore, a policy of title insurance is a contract by which the title insurer agrees to indemnify its insured for loss occasioned by a defect in title. (See.9 Appleman, Insurance Law and Practice, § 5201; 13 Couch, Insurance [2d ed], § 48:108.)
Beyond its purely contractual aspects, however, the unique nature of a title insurance transaction was quickly recognized by the courts. In Empire Dev. Co. v Title Guar. & Trust Co. (225 NY 53, 59-60), this court noted: “To a layman a search is a mystery and the various pitfalls that may beset his title are dreaded but unknown. To avoid a possible claim against him; to obviate the need and expense of professional advice, and the uncertainty that sometimes results even after it has been obtained is the very purpose for which the owner seeks insurance.” Rather than being treated merely as a contract of indemnity, title insurance was viewed as being more in the nature of a covenant of warranty against encumbrances under which'“mere knowledge of a defect [in title] by the insuring owner would not constitute a defense.” (Empire Dev. Co. v Title Guar. & Trust Co., supra, at p 61; Maggio v Abstract Tit. & Mtge. Corp., 277 App Div 940.)
Interestingly, in response to the decision in the Empire Dev. Co. case, title companies adopted as a standard provision in their policies the very misrepresentation clause at issue on this appeal. (See 5A Warren’s Weed New York Real Property, Title Insurance, § 2.08.) To date, however, this court has not been presented with an opportunity to examine the effect to be given to this clause in terms of imposing an obligation on the insured to disclose information to the insurer. Moreover, although at least one lower court has recognized the validity of this misrepresentation clause based on the insured’s failure to divulge information to its insurer (Glickman v Home Tit. Guar. Co., 15 Misc 2d 167, affd 8 AD2d 629), other courts of this State which have addressed the issue of an insured’s obligation to reveal information to its title insurer have held that the policy was voided by the insured’s failure to disclose only in instances where there was evidence of intentional concealment on the part of the insured and the undisclosed infor *189 mation concerned a matter not of public record. (Vaughan v United States Tit. Guar. & Ind. Co., 137 App Div 623; First Nat. Bank & Trust Co. of Port Chester v New York Tit. Ins. Co., 171 Misc 854, supra; cf. Sullivan v Tomgil Bldg. Corp., 46 Misc 2d 613.)
One Federal court, addressing a provision identical to that found in the defendant’s policy, stated that the clause “must be given a common sense application and, considering the nature of title insurance transactions, a duty to speak could be found only if the insurance applicant had actual knowledge of certain defects or encumbrances. Further, misrepresentation could be found only if one charged with such a duty to speak intentionally failed to disclose the information.” (Lawyers Tit. Ins. Corp. v Research Loan & Inv. Corp., 361 F2d 764, 768.) In a like manner, other jurisdictions which have addressed similar clauses have required a showing that the insured had actual knowledge of the title defect which was intentionally concealed from the insurer. Moreover, these cases indicated, either expressly or by implication, that the title policy would only be voided in instances where the undisclosed information was not discoverable by the insurer by reference to publicly filed records. (Collins v Pioneer Tit. Ins. Co., 629 F2d 429; Rosenblatt v Louisville Tit. Co., 218 Ky 714; Fohn v Title Ins. Corp. of St. Louis, 529 SW2d 1 [Mo]; Pioneer Nat. Tit. Ins. Co. v Lucas, 155 NJ Super 332, affd 78 NJ 320; Laabs v Chicago Tit. Ins. Co., 72 Wis 2d 503; Bush v Coult, 594 P2d 865 [Utah] ; see 9 Appleman, Insurance Law and Practice, § 5205; 7 Powell, Real Property, Title Insurance, par 1037.)
We agree with the view expressed by these cases. Therefore, we hold that a policy of title insurance will not be rendered void pursuant to a misrepresentation clause absent some showing of intentional concealment on the part of the insured tantamount to fraud. Moreover, because record information of a title defect is available to the title insurer and because the title insurer is presumed to have made itself aware of such information, we hold that an insured under a policy of title insurance such as is involved herein is under no duty to disclose to the insurer a fact *190 which is readily ascertainable by reference to the public records. Thus, even an intentional failure to disclose a. matter of public record will not result in a loss of title insurance protection.
In so holding, we merely recognize the practical realities of the transaction involved. As mentioned earlier, title insurance is procured in order to protect against the risk that the property purchased may have some defect in title. The emphasis in securing these policies is on the expertise of the title company to search the public records and discover possible defects in title. Thus, unlike other types of insurance, the insured under a title policy provides little, if any, information to the title company other than the lot and block of the premises and the name of the prospective grantor. Armed with this information, the title company then can search the various indices and maps to ascertain the state of title to the property. Indeed, it is because title insurance companies combine their search and disclosure expertise with insurance protection that an implied duty arises out of the title insurance agreement that the insurer has conducted a reasonably diligent search. (McLaughlin v Attorneys’ Tit. Guar. Fund, 61 Ill App 3d 911; Shotwell v Transamerica Tit. Ins. Co., 16 Wash App 627, 628-631, affd 91 Wn 2d 161; see 9 Appleman, Insurance Law and Practice, § 5213.) This duty may not be abrogated through a standard policy clause which would, if given the effect urged by defendant, place the onus of the title company’s failure adequately to search the records on the party who secured the insurance protection for that very purpose. (See Empire Dev. Co. v Title Guar. & Trust Co., 225 NY 53, supra.)
Of course, an intentional failure by the insured to disclose material information not readily discernible from the public records will render the policy void. .For instance, where the insured secures title insurance with knowledge that there exists some hidden defect in title, such as a forged deed, incapacity of the grantor, or the existence of an unrecorded easement (see, generally, 5A Warren’s Weed New York Real Property, Title Insurance, § 2.04) and the insured conceals that information from the title insurer, *191 then such a failure to disclose will result in nullification of the policy.
In this case, there was no showing that plaintiff’s agent, Tucker, intentionally failed to disclose the information concerning the Carvel Place condemnation. In fact, it would appear that defendant was at least put on notice as to the existence of condemnations affecting the Bass Rock property by the recital in the sales contract assigning all condemnation awards to plaintiff and by the discussion of the condemnation of the small southwest parcel which took place at the closing. In any event, it is undisputed that the existence of the St. George Street and Jeanette Avenue condemnations was readily ascertainable from the public records available at the Nassau County Clerk’s office. Defendant, having failed to avail itself of this information, now attempts to avoid its obligation under the policy by claiming that plaintiff failed to disclose material information concerning title to the property. However, because plaintiff was under no duty to disclose this publicly available information to defendant, the policy will not be rendered void pursuant to the misrepresentation provision found therein.
Finally, defendant’s answer contained a counterclaim premised upon an agreement entered into between the parties whereby the defendant advanced certain moneys in plaintiff’s behalf for taxes and expenses attributable to plaintiff’s attempt to secure a condemnation award from the Town of Hempstead. Pursuant to that agreement, plaintiff was to repay defendant the amounts so advanced subject to a setoff of any sums found due to plaintiff under its title policy. Inasmuch as plaintiff offers no basis for overturning the judgment rendered in defendant’s behalf on this counterclaim, we do not disturb that award. Of course, payment of the amounts owing under this counterclaim must await a determination of the amount due plaintiff as damages under its title policy.
Accordingly, the order of the Appellate Division should be modified, with costs to plaintiff, to the extent of reversing the dismissal of plaintiff’s first cause of action and remitting the case to Supreme Court, Nassau County, for a *192 trial on the issue of plaintiff’s damages. As so modified, the order should be affirmed.
Chief Judge Cooke and Judges Gabrielli, Jones, Wachtler and Fuchsberg concur; Judge Meyer taking no part.
Order modified, with costs to plaintiff, and the case remitted to Supreme Court, Nassau County, for a trial on the issue of plaintiff’s damages in accordance with the opinion herein and, as so modified, order affirmed.

 As a second cause of action, plaintiff alleged that defendant was negligent in conducting its title search by failing to discover the public records of the condemnations. The Appellate Division held that this second cause of action properly was dismissed because any claim of negligence in the title search merged into the subsequently issued title policy pursuant to the express terms of the certificate of title. Inasmuch as no appeal was taken by plaintiff from this determination, we do not concern ourselves here with plaintiff’s second cause of action in negligence.