[632 NYS2d 779]

CITIBANK, N. A., Respondent, v CHICAGO TITLE INSURANCE COMPANY, Appellant.

First Department, September 28, 1995

### APPEARANCES OF COUNSEL

*Jerome M. Lasky* of counsel *(David Rabinowitz* and *Edward R. Finkelstein* on the brief; *Moses & Singer,* attorneys), for appellant.

*Lawrence J. Slattery,* and *Schwall & Becker,* for respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

This appeal presents the issue of whether a mortgagee, here Citibank, the insured under a mortgage title insurance policy, may, absent proof that its alleged loss was occasioned by the subordination of the insured mortgage to other liens and encumbrances, recover damages against the insurer in negligence and/or breach of contract based upon the insurer's faulty title search.

In 1987, Citibank was approached by Thomas Duke with a proposal to refinance an existing mortgage held by Citytrust

in the principal amount of $790,000 on premises located at 11 Bevin Road West, Asharoken, New York. On July 17, 1987, as part of that refinancing, Duke executed and delivered to Citibank a mortgage and modification, extension and consolidation agreement (agreement) consolidating the $790,000 Citytrust mortgage, which had been assigned to Citibank, an additional mortgage on the same property securing a further $10,000 loan to Duke from Citibank, and a negative amortization mortgage in the sum of $80,000 to secure deferred interest payments on the two other mortgages. The three mortgages were modified, extended and consolidated into a single lien in the sum of $880,000.

Before entering into this transaction, Citibank requested mortgage title insurance from Chicago Title Insurance Company, which, after conducting a title search, issued its commitment for title insurance. The commitment included a "Report of Closing" prepared by an abstractor, Chicago Title's agent, setting forth, *inter alia,* a list of title defects which Chicago Title would not cover. The commitment, by its terms, represented Chicago Title's agreement to issue a title policy upon satisfaction of certain conditions. Indeed, it expressly provided: "This Commitment is preliminary to the issuance of such policy * * * of title insurance and all liability and obligations hereunder shall cease and terminate nine months after the effective date hereof or when the policy * * * committed for shall issue, whichever first occurs". The title policy insuring the $880,000 consolidated mortgage was issued on July 17, 1987, contemporaneously with the execution of that instrument.

Schedule B of the policy listed nine defects, liens, encumbrances and other matters against which Chicago Title did not insure. Unfortunately, it did not list the following four liens and filings, all of which were matters of public record:

(a) a mortgage for $500,000 from Thomas Duke to First City National Bank and Trust Company, dated November 26, 1986, to secure partially an indebtedness by Duke of $1.5 million;

(b) a judgment lien recovered by R.K. Chevrolet in the sum of $923,091.69, which was an encumbrance against the real property that was to be mortgaged by Duke;[1]

---

1. Duke was convicted of fraud in a Federal court in Virginia in connection with this matter. He was also later convicted in a Federal court in New York for bank fraud.

(c) a lis pendens disclosing that the Citytrust mortgage was itself being foreclosed upon; and

(d) a foreclosure action by one Alex Varveris for a mortgage loan in the amount of $150,000, as evidenced by a summons and complaint and lis pendens filed on May 1, 1987 in connection with the foreclosure action.

The total amount involved in these undisclosed liens and lis pendens, exclusive of the foreclosure action on the $790,000 Citytrust mortgage, was $1,573,091.69.[2] Duke, who had been in default under the Citytrust mortgage when Citibank acquired it, paid the arrears due to Citibank; without, however, ever making a single payment under the terms and conditions of the agreement, Duke defaulted under the consolidated mortgage. After several years of litigating with other lienholders to resolve priority issues, Citibank eventually foreclosed on its mortgage.

A judgment of foreclosure and sale was entered on May 8, 1992 in Supreme Court, Suffolk County, in favor of Citibank and the mortgaged property was eventually sold at auction. With an offer of $100,000, Citibank was the successful bidder, taking title to the mortgaged premises free and clear of the four alleged defects in title which had not been excepted in Schedule B of the title policy and for which Citibank would be entitled to compensation thereunder provided it suffered a "loss or damage" by reason of the defects. Each of these objections to title which the title policy failed to except were recorded against the mortgaged premises after the recording of the $790,000 Citytrust mortgage on August 18, 1986 and thus were subordinate to it. Since each mortgage in a consolidated mortgage retains its original priority *(see, UMB Bank & Trust Co. v S.H.M. W. Parking Corp.,* 181 AD2d 577), the consolidation of the three mortgages into a single consolidated mortgage in the sum of $880,000 did not affect the priority of the original $790,000 mortgage assigned by Citytrust to Citibank. At a hearing on Citibank's application for a deficiency judgment against Duke, the court determined the reasonable market value of the mortgaged property to be $470,000. Citi-

---

**2.** The lis pendens related to the Citytrust foreclosure was irrelevant since Citibank, at the July 17, 1987 closing, acquired the mortgage, which was subsequently cancelled of record. Similarly, the lis pendens with respect to the Varveris foreclosure was irrelevant because that mortgage was not only extended on July 16, 1987, prior to the closing of Citibank's consolidated mortgage on July 17, 1987, but it was also expressly subordinated to the Citibank mortgage.

bank subsequently obtained a deficiency judgment in the sum of $919,212.59 and claims a loss of $995,000.

In seeking to recover that amount in this lawsuit, based on theories of negligence and breach of contract, Citibank claims that it would not have extended the loan to Duke had it known "the true nature of [Duke's] financial circumstances", as would have been revealed by a proper title search; Citibank alleges that, as a lender, it relied on the information provided in the "report of title" in deciding whether to go forward with the loan transaction. The alleged breach consisted of Chicago Title's omission of the four defects from the "report of title." After joinder of issue, both parties moved for summary judgment. The IAS Court awarded summary judgment to Citibank and directed an assessment of damages, finding that Chicago Title, by neglecting to ascertain the existence of the four alleged defects in title, failed in its implied duty arising out of its issuance of a title policy to conduct a reasonably diligent search and to insure the accuracy of the search. The court found Chicago Title liable in both negligence and breach of contract under the policy. Thus, the court held that the issuance of a title policy entitles the insured not only to indemnification for loss sustained as a result of title defects, but also to a title search, the accuracy of which the policy insures. We reverse.

█ In finding for Citibank on its negligence claim, the IAS Court ignored well-settled law that a cause of action for negligence in searching title does not lie in an action on the policy. *(Trenton Potteries Co. v Title Guar. & Trust Co.,* 176 NY 65; *Maggio v Abstract Tit. & Mtge. Corp.,* 277 App Div 940, 941; *Charney v Commonwealth Land Tit. Ins. Co.,* 215 AD2d 152.)* "The contract of insurance is distinct and separate from the contract of searching. This action is brought upon the contract of insurance. Under the contract for searching titles the defendant may be liable for any damages which its negligence may have imposed upon the plaintiff [citation omitted]. Under the contract of insurance no question of negligence in searching can arise." *(Trenton Potteries Co. v Title Guar. & Trust Co., supra,* at 75.) "In the case of a title insurance policy, the insurer undertakes to indemnify the insured if the title turns out to be defective. * * * The doctrine of skill or negligence has no application to a contract of title insurance." *(Maggio v Abstract Tit. & Mtge. Corp., supra,* at 941.) To be sure, "title insurance [is] viewed as being more in the nature of a cove-

nant of warranty against encumbrances." *(Smirlock Realty Corp. v Title Guar. Co.,* 52 NY2d 179, 188.)

In holding that a title insurer may be held liable in negligence arising out of its issuance of a title policy, the IAS Court *(Citibank v Chicago Tit. Ins. Co.,* 163 Misc 2d 282, 286-287), cited *Smirlock Realty Corp. v Title Guar. Co.* (52 NY2d 179, *supra),* which involved a claim against a title insurer for negligence and breach of contract due to the diminution in value caused by a defect in title not mentioned either in the certificate of title or the subsequently issued title policy. As here, the certificate of title contained a provision that any liability thereunder terminated upon the issuance of the title policy. On that basis, the Appellate Division (70 AD2d 455, 465-466, *mod on other grounds* 52 NY2d 179, *supra)* affirmed the dismissal of the negligence action, holding, "[w]here, as here, the certificate of title has merged in the subsequently issued title issuance policy, any action for damages arising out of the search—whether sounding in tort or contract—is foreclosed." Echoing *Trenton Potteries,* the Appellate Division also specifically held that a negligence claim could be asserted only under the certificate of title: "The contract for a title search is separate and distinct from the contract of insurance; liability for a negligent search arises from the former." *(Supra,* at 465.)

The Court of Appeals specifically disclaimed any consideration of the negligence claim because no appeal had been taken from that aspect of the Appellate Division's determination. (52 NY2d, *supra,* at 185, n.) Its decision concerned only the disclaimer of liability under a misrepresentation clause in the title policy based on the insured's alleged failure to divulge material facts, of which it was aware prior to the closing of title, giving rise to a title defect. The Court of Appeals held that the insurer could not disclaim as to defects of record, even on the basis of an intentional failure to disclose, absent some showing of intentional concealment tantamount to fraud, since such information was available to the title insurer, which is presumed to have made itself aware of the available facts. *(Supra,* at 189-190.) In further explaining its position, the Court noted that "[t]he emphasis in securing [title] policies is on the expertise of the title company to search the public records and discover possible defects in title" and that because title insurers "combine their search and disclosure expertise with insurance protection * * * an implied duty arises out of the title insurance agreement that the insurer has conducted a reasonably diligent search." *(Supra,*

at 190.) Thus, the Court held, that duty could not be abrogated by a policy's misrepresentation clause, which, if given the effect urged by the insurer, would "place the onus of the title company's failure adequately to search the records on the party who secured the insurance protection for that very purpose." *(Supra,* at 190.)

*Smirlock* utilized the title insurer's duty to conduct a reasonably diligent search to avoid the insurer's attempt, by invocation of the policy's misrepresentation clause, to shift the burden of risk disclosure to the insured, rather than the insurer, where it rightfully belongs. *Smirlock* did not, as Citibank argues and the IAS Court held, create a right of action in behalf of the insured against the title insurer for negligence in conducting a title search. Nowhere in *Smirlock* did the Court ever refer to *Trenton Potteries (supra)* or its progeny; surely if the Court had intended to overrule such a long-standing precedent and impose negligence liability under a policy of title insurance, it would have done so explicitly.

Nor is *Herbil Holding Co. v Commonwealth Land Tit. Ins. Co.* (183 AD2d 219), a Second Department decision cited by the IAS Court, on point. That case stands for the unremarkable proposition that a title policy exception for the " '[r]ights of tenants or persons in possession' " *(supra,* at 221) will not exclude coverage with respect to the claim of a possessor of the property whose rights arise under a recorded instrument. The person in possession was the record owner against whom a foreclosure judgment under which the insured purchased the property was improperly entered. The statement relied upon in *Herbil*—"liability can arise in the event the search is performed in a negligent manner" *(supra,* at 229)—was made in the context of the potential liability of the "abstract company engaged by the insured" *(supra,* at 229), which was also an agent of the title company. Thus, neither the Court of Appeals decision in *Smirlock* nor *Herbil* overrules the line of established precedent going back to *Trenton Potteries* or provides support for the IAS Court's determination that an insurer can be held liable under a title policy for negligence in conducting a title search.

Moreover, Citibank's basic claim that, in making the loan, it relied on Chicago Title's representation that there were no title defects with respect to the mortgaged property, other than those excepted in Schedule B of its policy, is basically at odds with the procurement of an insurance policy to protect it against losses it might suffer from undisclosed title defects.

*(See, Focus Inv. Assocs. v American Tit. Ins. Co.,* 992 F2d 1231, 1237, n 10 [1st Cir 1993].)* In that regard, it is somewhat incongruous to argue that an insurance policy covering a certain risk carries with it a representation or guarantee that the risk insured against will not occur. Insurance is written to hedge against the risk's occurrence, not as a guarantee that it will not occur.

In this regard, we note, given the nature of the coverage and the limited life of the commitment, that the purpose of Chicago Title's title search was to enable it to discover known title defects with the view of having them corrected before the policy went into effect or excluding them from the scope of its coverage. Citibank did not commission any searches and paid for none. Chicago Title never issued a "title search" or "abstract of title". It issued only its "Commitment for Title Insurance" and the "American Title Association Standard Loan Policy", both of which listed the title defects primarily it was excepting from coverage. That search was made for its benefit—to exclude the risks it would not cover—not for the benefit of Citibank. *(Matter of City Tit. Ins. Co. v Superintendent of Ins. of State of N. Y.,* 31 Misc 2d 1012, 1013, *affd* 16 AD2d 768, *affd* 13 NY2d 686.)* We recognize, of course, that lenders and buyers alike customarily rely on a title insurer's title search, which enables them to decide whether to cure the defect and conclude the transaction or proceed no further. *(See, Ticor Tit. Ins. Co. v Federal Trade Commn.,* 922 F2d 1122 [3d Cir 1991], *revd and remanded on other grounds* 504 US 621.)* That circumstance, however, does not, absent some other commitment from the insurer, render the search an independent representation as to title, which survives delivery of the policy and gives rise to a cause of action in negligence or misrepresentation. What the search does, depending on the schedule of exceptions that survive the policy's issuance, is define the scope of coverage with respect to known defects. Unknown defects, unless otherwise excluded, are, of course, covered.

The IAS Court also cited Insurance Law § 1113 (a) (18) in support of its holding that title insurers insure the correctness of their title searches. In so ruling, the court misread the statute and failed to differentiate between title insurance policies and guaranteed searches. Under the Insurance Law, title policies are considered separate and distinct from contracts for the making, or insuring the correctness, of title searches. Insurance Law § 6401 (b) defines a title insurance

policy as "any policy or contract insuring or guaranteeing the owners of real property and chattels real and other persons interested therein, or having liens thereon, against loss by reason of encumbrances thereon and defective titles", thus ascribing to the title policy a scope of coverage consistent with case law. Insurance Law § 6403 (b), which is also part of article 64, sets forth the powers of a title insurance corporation, and makes the distinction between a title insurance policy and the guarantee of the correctness of a title search. Insofar as is pertinent, it provides:

"Every title insurance corporation shall * * * have power to do * * * only the following kinds or any of the kinds of business, of which those specified in paragraphs one and two hereof shall be deemed doing an insurance business:

"(1) [t]o make and to guarantee the correctness of searches for all instruments affecting titles to real property, chattels real, and cooperative units and proprietary leases, and for all liens or charges affecting the same[;]

"(2) [t]o issue title insurance policies." *(Ibid.)*

Thus, title insurers have the power, but not the obligation, to issue either a guarantee of the correctness of a search or a title policy or both. Here, Chicago Title issued a title policy, not a guaranteed search.

The IAS Court ignored the foregoing sections and, instead, as noted, relied on Insurance Law § 1113 (a) (18), which provides, " 'Title insurance,' means insuring owners of, and other persons lawfully interested in, real property and chattels real against loss by reason of defective titles and encumbrances and insuring the correctness of searches for all instruments, liens or charges affecting the title to such property." The court interpreted that section as defining a policy of title insurance and construed it to mean that all the coverages described therein are imputed to a title policy. Section 1113 is entitled "Kinds of insurance authorized"; subdivision (a), which, in part, states, "The kinds of insurance which may be authorized in this state, subject to other provisions of this chapter, and their scope, are set forth in the following paragraphs", makes clear that section 1113 (a) merely lists the kinds of insurance that insurers may offer. It does not mandate what they must offer.

Moreover, " '[t]itle insurance' " (Insurance Law § 1113 [a] [18]) is different from a " '[t]itle insurance policy,' " which, as noted, is defined as "any policy or contract insuring or guaran-

teeing * * * against loss by reason of encumbrances * * * and defective titles" (Insurance Law § 6401 [b]). Thus, under the Insurance Law, a " '[t]itle insurance policy' ", defined in section 6401 (b), is a form of " '[t]itle insurance' ", which is defined in section 1113 (a) (18). A guaranteed search is a form of " '[t]itle insurance' ", as is a title insurance policy. *(See,* Insurance Law § 6403 [b] [1], [2].) The two are separate and distinct instruments.

The policy at issue, by its express terms, insured Citibank "against loss or damage not exceeding the amount of insurance set forth herein which the Insured shall sustain by reason of any defect in, or lien or encumbrance on said title at the date hereof * * * other than defects, liens, encumbrances and other matters set forth in Schedule B, or by reason of the priority thereto of any lien or encumbrance at the date hereof except as shown by Schedule B." Paragraph 3 of the policy's Conditions and Stipulations provides that Chicago Title's obligation to indemnify is triggered, *inter alia,* "if the successful bidder at a foreclosure * * * sale refuses to complete the purchase, because of alleged defects in the title to said land, and * * * the said title has been declared by a court of competent jurisdiction to be defective or encumbered or otherwise unmarketable by reason of any defect, lien or encumbrance insured against by this Policy." In such case, Chicago Title, at its option, shall either (a) pay Citibank the amount of the policy, (b) purchase the indebtedness from Citibank, (c) establish the marketability of title by decree of court or (d) "otherwise save [Citibank] harmless." It is undisputed that none of these conditions to Chicago Title's obligation to indemnify has occurred.

▇ It is a well-settled principle that the title insurer's obligation to indemnify is defined by the policy itself and limited to the loss in value of the title as a result of title defects against which the policy insures. As the Court of Appeals stated in *Smirlock* (52 NY2d, *supra,* at 188), "a policy of title insurance is a contract by which the title insurer agrees to indemnify its insured for loss occasioned by a defect in title." "Such a policy entitles the insured to indemnity only to the extent that its security is impaired and to the extent of the resulting loss which it sustains" *(Diversified Mtge. Investors v U.S. Life Tit. Ins. Co.,* 544 F2d 571, 574-575, n 2 [2d Cir 1976]).

*Grunberger v Iseson* (75 AD2d 329), a decision by this Court, is illustrative of the rule that title insurance only provides

indemnification for any diminution in the value of property sustained as a result of defects in a title insured by the policy. There, the title insurer had insured the plaintiff's mortgage showing two superior mortgages in its report of title. A fourth, held by the defendant, was marked " 'omit' " *(supra,* at 330). When the plaintiff foreclosed, she joined the defendant, who counterclaimed, alleging superiority of mortgage. She also commenced a second action against both the defendant and the title insurer seeking, *inter alia,* a declaration as to which mortgage, hers or the defendant's, had priority as the third mortgage. The defendant's mortgage was found to be superior. During the same period of time, the holder of the second mortgage foreclosed and, as a result of a foreclosure sale, was left with a deficiency. Thus, there was no surplus money available for the third and fourth mortgagees, the defendant and the plaintiff, respectively. Thereafter, the title insurer moved to dismiss the complaint, arguing, while conceding its error in omitting the defendant's mortgage as an exception under its policy, that since the third mortgagee did not receive any benefit from the foreclosure sale the plaintiff sustained no damage within the policy terms as a result of being adjudged a fourth, rather than a third, lienor. The title insurer also argued that any loss the plaintiff sustained was due, not to its error, but to the plaintiff's poor investment. The motion court found issues of fact on the issue of damages, such as the market value of the property at the time of the foreclosure sale, the sum due on the plaintiff's mortgage and whether there was surplus money after the foreclosure sale. This Court dismissed the cause of action for recovery under the policy, holding that the plaintiff had not sustained any damage since coverage was limited to "loss or damage sustained when, 'because of a defect in the title, the insured was bound to pay something to make it good.' " *(Supra,* at 332, quoting *Empire Dev. Co. v Title Guar. & Trust Co.,* 225 NY 53, 60.) In *Grunberger,* as here, the insured had incurred no loss attributable to the title defect. Citibank's foreclosure action wiped out the four complained-of title defects and, as the successful bidder at the foreclosure sale, it acquired title to the mortgaged premises free and clear of these defects. Thus, Citibank suffered no loss or damage caused by a defect in title.

Of course, Citibank, under its contract action, is entitled to the recovery of the counsel fees it has incurred in successfully establishing the priority of its mortgage over the title defects at issue herein.

Accordingly, the order of the Supreme Court, New York County (Walter M. Schackman, J.), entered September 30, 1994, denying defendant's motion for summary judgment dismissing the negligence cause of action and for partial summary judgment with respect to the breach of contract cause of action and granting plaintiff's cross motion for summary judgment and directing an assessment of damages, should be reversed, on the law, without costs or disbursements, the motion granted and the cross motion denied.

ELLERIN, WALLACH, WILLIAMS and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered September 30, 1994, reversed, on the law, without costs or disbursements, defendant's motion for summary judgment dismissing the negligence cause of action and for partial summary judgment with respect to the breach of contract cause of action granted, and plaintiff's cross motion for summary judgment directing an assessment of damages denied.