Matter of New York State Land Tit. Assn., Inc. v New York State Dept. of Fin. Servs. (2019 NY Slip Op 00245)





Matter of New York State Land Tit. Assn., Inc. v New York State Dept. of Fin. Servs.


2019 NY Slip Op 00245


Decided on January 15, 2019


Appellate Division, First Department


Singh, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 15, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

John W. Sweeny, Jr., J.P.
Ellen Gesmer
Jeffrey K. Oing
Anil C. Singh, JJ.


151562/18 7491 

[*1]In re New York State Land Title Association, Inc., et al., Petitioners-Respondents,
T
v
he New York State Department of Financial Services, et al., Respondents-Appellants. 
American Land Title Association, Amicus Curiae.



Respondents appeal from an order of the Supreme Court, New York
County (Eileen A. Rakower, J.), entered on or about July 5, 2018, which granted the petition to annul Insurance Regulation 208, codified at 11 NYCRR 228 on October 18, 2017, effective December 18, 2017.




Barbara D. Underwood, Attorney General, New York (Steven C. Wu and Matthew William Grieco of counsel), for appellants.
Gibson, Dunn & Crutcher LLP, New York (Mylan L. Denerstein, Akiva Shapiro and Lee R. Crain of counsel), for respondents.
Herrick Feinstein, LLP, New York (Arthur G. Jakoby and Elena T. McDermott of counsel), for amicus curiae.



SINGH, J.


The primary issues on this appeal are whether Insurance Law § 6409(d) is ambiguous as to the term "other consideration or valuable thing," and whether certain provisions of Insurance Regulation 208, promulgated by the Department of Financial Services (DFS) have a rational basis. Insurance Law § 6409(d) was enacted by the Legislature to explicitly prohibit the practice of kickbacks from insurers to title closers, attorneys, and other agents in the real estate market. The statute forbids insurers from giving, among other things, "other consideration or valuable thing" to "any person, firm, or corporation acting as agent, representative, attorney, or employee of the owner, lessee, mortgagee or of the prospective owner." Insurance Regulation 208 was [*2]promulgated to ensure proper and non-excessive rates for purchasers of title insurance [FN1] and reasonable charges for ancillary services, such as closer's fees.[FN2]
We find that Insurance Law § 6409(d) is unambiguous, and that, with the exception of two provisions, Insurance Regulation 208 has a rational basis as it echoes and further defines the legislative intent behind Insurance Law § 6409(d).
Background
The genesis of this dispute is a set of regulations of the title insurance industry promulgated by respondent DFS as Insurance Regulation 208, codified at 11 NYCRR 228, on October 18, 2017, and effective December 18, 2017.
"By definition, title insurance involves insuring the owners of real property . . . against loss by reason of defective titles and encumbrances thereon and insuring the correctness of searches for all instruments, liens or charges affecting the title to such property" (L. Smirlock Realty Corp. v Title Guar. Co., 52 NY2d 179, 187 [1981]). "Essentially, . . . a policy of title insurance is a contract by which the title insurer agrees to indemnify its insured for loss occasioned by a defect in title" (id. at 188).
DFS was created to accomplish a number of goals including "[t]o promote the reduction and elimination of . . . unethical conduct by, and with respect to . . . insurance . . . institutions and their customers" (Financial Services Law § 102[k]). "Responsibility for administering the Insurance Law rests with the Superintendent" of DFS, "who has broad power to interpret, clarify, and implement the legislative policy" (Matter of Medical Socy. of State of N.Y. v Serio, 100 NY2d 854, 863-64 [2003] [internal quotation marks and citations omitted]). "[T]he Superintendent's interpretation, if not irrational or unreasonable, will be upheld in deference to [her] special competence and expertise with respect to the insurance industry, unless it runs counter to the clear wording of a statutory provision'" (id. at 864).
Title insurers are required to file with DFS rate manuals, among other documents related to premium rates and the issuance of policies (Insurance Law § 6409[b]). In order to assess how the insurers were calculating premiums, DFS conducted an investigation of all licensed title insurers in New York State based on information from 2008 to 2012. On December 10, 2013, DFS held a public hearing, at which industry representatives and expert witnesses testified and provided written statements.
Following the investigation, DFS determined that some practices that resulted in higher premiums and closing costs for consumers, violate Insurance Law § 6409(d). DFS found that "insurers reported meal and entertainment expenses in the following categories: advertising, marketing and promotion, and travel, and other'" (Statement of Maria T. Vullo, Superintendent New York State DFS, Prepared for Delivery at Public Hearing: An Examination of Recent Title Insurance Regulation in New York, January 12, 2018) and expenses reported in the "other" category were "replete with excessive entertainment," often including "wining and dining . . . of real estate professionals" (id.). For example, one insurer spent approximately $2.5 million to $5.4 million a year, amounting to about 5% to 14% of its charged premiums, on tickets to basketball, baseball, and tennis events for attorneys and other clients in a position to refer business to the insurer (id.). Some insurers paid for their clients to go to bars, strip clubs, and Hooters restaurants (id.). Insurers paid for "expensive designer goods" and "gift cards" for referral sources (id.). One insurer spent about 15% to 30% of premiums on entertainment and gifts for referral sources. Another insurer spent about 50% of its revenue on meals for referral [*3]sources. Insurers would report these expenses in the information submitted to DFS to support the premiums they charged (id.).
As a result of its investigation, DFS estimated that, on average, 5.3% of premiums charged statewide violated Insurance Law § 6409(d) from 2008 to 2012. To prevent such practices and to protect consumers from exorbitant costs, DFS promulgated Insurance Regulation 208.
Insurance Regulation 208
The statement of scope and purpose of Insurance Regulation 208 observed that "[c]onsumers of title insurance usually rely upon the advice of real estate professionals, including attorneys or real estate agents, who order the policy on their behalf," and that "[c]onsumers also typically pay any invoice presented at the closing without seeking documentation or further clarification" (11 NYCRR 228.0[a]).
Insurance Regulation 208 states:
"Pursuant to Insurance Law [§ ] 6409(d) [among other provisions], no [title insurer] or any other person acting for or on behalf of [one] . . . shall offer or make any rebate, directly or indirectly, or pay or give any consideration or valuable thing, to any applicant, or to any person, firm or corporation acting as an agent, representative, attorney or employee of the actual or prospective owner, lessee, mortgagee of the real property or any interest therein, as an inducement for, or as compensation for, any title insurance business, including future title insurance business, and maintaining existing title insurance business, regardless of whether provided as a quid pro quo for specific business" (11 NYCRR 228.2[a] [emphasis added]).
The Regulation specifies both impermissible (11 NYCRR 228.2[b]) and permissible practices (11 NYCRR 228.2[c]).
11 NYCRR 228.2 b) specifically prohibits an insurer from offering any of the following as an inducement, a list which "should not be considered as exclusive or exhaustive" (11 NYCRR 228.2[d]):
"(1) Meals and beverages unless otherwise authorized under sub-division (c) of this section;
"(2) entertainment, including tickets to sporting events, concerts, shows or artistic performances;
"(3) gifts, including cash, gift cards, gift certificates, or other items with a specific monetary face value;
"(4) outings, including vacations, holidays, golf, ski, fishing, and other sport outings, gambling trips, shopping trips, or trips to recreational areas, including country clubs;
"(5) parties, including cocktail parties and holiday parties, open houses;
"(6) providing assistance with business expenses of another person, including . . . rent, employee salaries, advertising, furniture, office supplies, . . . or automobiles, or leasing, renting, operating, or maintaining any of such items, for use by other than a[n insurer];
"(7) use of premises, unless a fair rental fee is charged that is equal to the market value in the premises' geographical area;
"(8) paying the fees or charges of any professional representing an insured as part of a [*4]real estate transaction, such as an attorney . . . appraiser . . . , or paying rent or . . . any part of the salary or other compensation of any employee or officer of any current or prospective customer; and
"(9) providing or offering to provide non-title services, without a charge that is commensurate with the actual cost thereof" (11 NYCRR 228.2[b]).
However, the Regulation continues, "[s]ubject to subdivision (a) or (b) of" section 228.2, certain expenses, which are listed "as examples of permitted ... practices under Insurance Law 6409(d)" and "should not be considered as exclusive or exhaustive" (11 NYCRR 228.2[d]), are "permissible provided that they are without regard to insured status or conditioned directly or indirectly on the referral of title business, and offered with no expectation of, or obligation imposed upon, to refer, apply for or purchase insurance," and provided that they are "reasonable and customary, and not lavish or excessive" (11 NYCRR 228.2[c]):
"(1) Advertising or marketing in any publication, or media, at market rates;
"(2) Advertising and promotional items of a de minumus [sic] value that include a permanently affixed logo of a title insurance agent or title insurance corporation;
"(3) Promotional or marketing events including complementary [sic] food and beverages that are open to and attended by the general public;
"(4) Continuing legal education events including complementary [sic] food and beverages that are open to any member of the legal profession;
"(5) Complementary [sic] attendance offered by a title insurance corporation, title insurance agent as a host of a marketing or promotional event, including food and beverages available to all attendees so long as (a) title insurance business is discussed for a substantial portion of the event including a presentation of title insurance products and services, (b) such events are not offered on a regular basis or as a regular occurrence, and (c) at least twenty-five diverse individuals from different organizations not affiliated with the host attend or were, in good faith, invited to attend in person;
"(6) Charitable contributions made by negotiable instrument made payable only to the charitable organization in the name of the title insurance corporation or title insurance agent;
"(7) Political contributions" (11 NYCRR 228.2[c]).
DFS promulgated a related regulation prohibiting an insurer from including in expense schedules "any expenditure that is prohibited or exceeds any expenditure permitted under the Insurance Law or this Part" (11 NYCRR 228.3[a][1]). The regulation presents three options to insurers: (1) insurers could either certify a lack of any improper expenses in the past six years; (2) submit new rates not based on any improper expenses; or (3) submit a uniform 5% reduction in its base rates (11 NYCRR 228.3[c]).
Additionally, 11 NYCRR 228.5(d) imposes an absolute ban on the collection of certain fees by in-house closers, who are employed by title insurers, but permits independent closers to collect those fees as long as the fees are reasonable and the requisite notice is provided to [*5]consumers.
Finally, DFS promulgated 11 NYCRR 228.5(a), which provides that an insurer "shall not charge an applicant in connection with a residential real property closing an ancillary or other discretionary fee more than" 200% of the insurer's out-of-pocket costs paid for "a Patriot search" (11 NYCRR 228.5[a][1]),[FN3] "a bankruptcy search" (id. 228.5[a][2]), or "municipal or departmental search" (id. 228.5[a][3]), unless the insurer does not pay any out-of-pocket costs for such a search, in which case the insurer shall not charge the applicant more than 200% of whichever is less: the amount charged by an affiliated third party, or the fair market value of the search as charged by a non-affiliated third party (id. § 228.5[a][1-3]). 11 NYCRR 228.5(a)(1)-(3) caps fees for certain ancillary searches at 200% of the out-of-pocket costs of those searches, or 200% of certain other measures in the absence of any out-of-pocket costs. The regulations are intended to reduce "exorbitant" costs to consumers.
The CPLR Article 78 Proceeding
On February 20, 2018, petitioners commenced this CPLR article 78 proceeding seeking to annul Insurance Regulation 208, arguing, among other things, that its provisions are arbitrary and capricious, and that the regulation exceeds DFS's regulatory authority in violation of separation of powers.
Supreme Court granted the petition, and annulled Insurance Regulation 208 in its entirety. Specifically, the court concluded that the provision "other consideration or valuable thing" was ambiguous as to whether it embraced "marketing and entertainment expenses." The court reasoned that the legislative materials supporting Insurance Law § 6409(d) indicate that it was promulgated to "permit reduction in the cost of title coverage by barring payment of commissions to attorneys or real estate brokers by title insurers; prohibiting the receipt of any commission or rebate as an inducement for the placement of title insurance business," all of which do not encompass marketing and entertainment expenses.
The court explained that it reached its conclusions by applying the principle that "the meaning of an ambiguous word" should be interpreted "in relation to the meanings of adjacent words" (Matter of Kese Indus. v Roslyn Torah Found., 15 NY3d 485, 491 [2010]). It held that the statutory term " other consideration or valuable thing' cannot embrace ordinary marketing and entertainment expenses because ordinary marketing and entertainment expenses are not akin to rebate,' fee,' premium,' charge' and commission,'" as such expenses were not intended to be barred by the Legislature. Rather, those terms, "when construed together, indicate that the Legislature sought to remedy the mischief of kickbacks." The court further observed that this interpretation is consistent with the title of Insurance Law § 6409: "Filing of policy forms; rates; classification of risks; commissions and rebates prohibited" (id. [emphasis added]). Accordingly, the court found that it must annul the regulation on inducements and its related regulations.
Additionally, Supreme Court held that DFS's rationale for its regulation on payments to closers was "irrational" and "internally inconsistent," as the distinction based on the closer's status as in-house or independent was arbitrary. It further found that the ancillary fee cap regulation was arbitrary because "[t]he 8 affidavits submitted by [DFS] are . . . devoid of any [*6]economic or other analysis justifying the 200% caps imposed," and "the record provided is without any formulas or explanation begging the question as to whether 200% is just as arbitrary a figure as 300% or 150%."
Supreme Court concluded that the foregoing rules required annulling Insurance Regulation 208 in its entirety, to avoid excising so many provisions that the remaining provisions would be potentially inconsistent with what DFS intended in promulgating the regulations and the legislative intent underlying the enabling statutes. Alternatively, even if the foregoing regulations were severable, the court found that the ancillary fee caps should be annulled as arbitrary and capricious. DFS appeals.
Insurance Law § 6409(d)
We conclude, contrary to Supreme Court's determination, that Insurance Law § 6409(d) is unambiguous as to the term "other consideration or valuable thing." Generally, when interpreting a statute, courts "look first to the statutory text, which is the clearest indicator of legislative intent," since it is "fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature" (Matter of Anonymous v Molik, 32 NY3d 30, 37 [2018] [internal citations omitted]). "[W]here the language of a statute is clear and unambiguous, courts must give effect to its plain meaning," as the "literal language of a statute is generally controlling unless the plain intent and purpose of a statute would otherwise be defeated" (id. [internal citations and quotation marks omitted]).
Statutory construction requires that "all parts of a statute . . . be given effect," since "a statutory construction which renders one part meaningless should be avoided" (id.). The statute's sections "must be considered together and with reference to each other" (id.). A court should only substitute its own interpretation of a statute where "the language is ambiguous or where literal construction would lead to absurd or unreasonable consequences that are contrary to the purpose of the [statute's] enactment" (id.).
Insurance Law § 6409(d) provides that
"[N]o [insurer] or any other person acting for or on behalf of [one] . . . shall offer or make, directly or indirectly, any rebate of any portion of the fee, premium or charge made, or pay or give to any applicant, or to any person, firm, or corporation acting as agent, representative, attorney, or employee of the owner, lessee, mortgagee or the prospective owner, lessee, or mortgagee of the real property or any interest therein, either directly or indirectly, any commission, any part of its fees or charges, or any other consideration or valuable thing, as an inducement for, or as compensation for, any title insurance business, nor shall any applicant, or any person, firm, or corporation acting as agent, representative, attorney, or employee of the owner, lessee, mortgagee or of the prospective owner, lessee, or mortgagee of the real property or anyone having any interest in real property knowingly receive, directly or indirectly, any such rebate or other consideration or valuable thing" (emphasis added).
The plain text of Insurance Law § 6409(d) unambiguously prohibits an insurer from "offer[ing] or mak[ing], directly or indirectly, . . . any commission, any part of its fees or charges, or any other consideration or valuable thing, as an inducement for, or as compensation for, any title insurance business" (emphasis added). The statute repeatedly states that a proscribed exchange may be done "indirectly." After listing specific types of consideration such as commissions, the legislature elaborates and plainly expands the statute's parameters to "any other consideration or valuable thing, as an inducement for, or as compensation for, any title insurance business" (Insurance Law § 6409[d] [emphasis added]). The use of the word "any" unambiguously indicates that this legislative prohibition was intended to be broadly construed, allowing for DFS to define "any other consideration or valuable thing," provided, of course, it [*7]had a rational basis to do so.
Moreover, the phrases "an inducement" and "any title insurance" need not refer to a quid pro quo concerning one specific act of doing business, but may reasonably be applied to a more longstanding arrangement in which insurers regularly spend vast sums of money on extravagant gifts for referral sources, who are tacitly expected to return the favors by providing a reliable stream of referrals.
"[T]he Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation" (Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249, 254 [2004] [internal quotation marks and citation omitted]). "In so doing, an agency can adopt regulations that go beyond the text of that legislation, provided they are not inconsistent with the statutory language or its underlying purposes" (id.). Such a regulation should be upheld as long as it "is consistent with its enabling legislation and is not so lacking in reason for its promulgation that it is essentially arbitrary" (id. [internal quotation marks and citation omitted]).
Here, DFS conducted an investigation of the title insurance industry covering a recent five-year period. It found that lavish gifts were routinely being offered in anticipation of receiving business from intermediaries such as lawyers, generally unbeknownst to and at the expense of consumers, who ultimately pay higher premiums as a result. DFS reasonably sought to put an end to this ethically dubious scheme by clarifying that such practices are impermissible under Insurance Law § 6409(d).
Supreme Court annulled section 228.2(a) on the ground that Insurance Law § 6409(d) is limited to quid pro quo exchanges for specific business. To be sure, Insurance Law § 6409(d) prohibits a direct exchange of kickbacks for specific business. However, this narrow interpretation of Insurance Law § 6409(d) failed to accord proper deference to DFS's rational interpretation of a statute within the field of its expertise (see Matter of Medical Socy. of State of NY, 100 NY2d at 863-864; see also Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health, 85 NY2d 326, 331 [1995]).
Moreover, had the Legislature intended to limit this provision to the direct exchange of consideration for a specific referral or some other discrete business, the Legislature could have more clearly expressed such a relatively narrow prohibition by simply referring to "consideration as compensation for title insurance business." Instead, after listing specific consideration such as commissions, the Legislature referred more expansively to "any other consideration or valuable thing, as an inducement for, or as compensation for, any title insurance business" (Insurance Law § 6409[d]).
Further, the phrases "an inducement" and "any title insurance" need not refer to a quid pro quo concerning one specific act of doing business, but can reasonably be applied to a more longstanding arrangement in which insurers regularly spend vast amounts of money on gifts to sources who are expected to provide a reliable stream of referrals in exchange (id.). We find that Insurance Regulation 208's ban on such practices is harmonious with the legislative language and intent to prevent consumers from being required to subsidize unscrupulous exchanges of valuable things for real estate professionals.
Petitioners' contention that 11 NYCRR 228.3(c) is impermissibly retroactive and otherwise arbitrary and capricious is without merit (see Matter of Acevedo v New York State Dept. of Motor Vehs., 29 NY3d 202, 228-229 [2017]). The regulation does not penalize insurers for past conduct that was subsequently prohibited. It simply requires insurers to submit accurate information about their relevant expenses, in accordance with existing law including Insurance Law § 6409(d), as the basis for establishing future rates to be approved by DFS (see id.). It also gives them a fallback option to have a uniform 5% rate cut, which DFS supported with an [*8]affidavit explaining its formula and how it reached the 5% conclusion. Rather than violate insurers' due process rights, this procedure allows insurers to avoid having to explain and submit documentation of its previous expense schedules, less the expenditures that violated Insurance Regulation 208 (11 NYCRR 228.3[c]).
Restrictions on Payments to Closers
Next, we turn to whether Supreme Court erred in annulling the restrictions on payments to closers. We agree with Supreme Court's conclusion that there is no rational basis for DFS to impose an absolute ban on the collection of certain fees by in-house closers while permitting independent closers to collect the same fees as long as the fees are reasonable and the requisite notice is provided to consumers (11 NYCRR 228.5[d]). DFS's assertion that if independent closers were not allowed to charge fees in excess of premiums they would likely leave the industry is speculative at best, and ultimately fails to reconcile DFS's contradictory positions about the legality of closer fees. As Supreme Court noted, DFS's rationale for this internally inconsistent regulation fails to justify the distinction between independent and in-house closers.
Ancillary Search Fees
Nor is there a rational basis for capping fees for certain ancillary searches at 200% of the out-of-pocket costs of those searches or 200% of certain other measures in the absence of any out-of-pocket costs (11 NYCRR 228.5[a][1]-[3]). DFS's argument that the 200% cap allows insurers to be adequately compensated for the additional costs of conducting such searches while turning a reasonable profit is conclusory (see New York State Assn. of Counties v Axelrod, 78 NY2d 158, 167-168 [1991]). In the absence of further "empirical documentation, assessment and evaluation" to support this regulation, the 200% caps appear to be based on an "arbitrary, across-the-board percentage figure"; thus, section 228.5(a)(1)-(3) is "so lacking in reason for its promulgation that it is essentially arbitrary" (id. at 167-168 [internal quotation marks and citations omitted]).
Severability of Invalid Regulations
DFS contends that even if the court properly annulled any of the foregoing regulations, Supreme Court erred in annulling the remainder of Insurance Regulation 208 on the ground that the rules on inducements and closer fees were inseverable. We agree.
The test for whether statutory provisions are severable is "whether the Legislature would have wished the statute to be enforced with the invalid part exscinded" (People v On Sight Mobile Opticians, 24 NY3d 1107, 1109 [2014] [internal quotation marks and citations omitted]). Generally, if the provision is "at the core of the statute, and interwoven inextricably through the entire regulatory scheme," the entire statute may be invalidated (id. at 1110 [internal quotation marks and citation omitted]).
Here, the regulations on closer fees and ancillary fee caps, which were properly annulled, concern a "discrete regulatory topic" (id.) with little bearing on the validly promulgated rule against improper inducements. Petitioners have failed to show that any invalid regulations are inextricably intertwined with any other provisions of Insurance Regulation 208. Accordingly, we conclude that the invalid regulations are severable from the remainder of Insurance Regulation 208 so that the entire regulation need not be annulled in its entirety [FN4] (see id. at 1109-1110).
[*9]Separation of Powers
Finally, we reject petitioners' argument that Insurance Regulation 208 in its entirety violates the principle of separation of powers. An agency exceeds its regulatory mandate and usurps the legislative role when it "reache[s] its own conclusions about the proper" balance of conflicting "political, social and economic" interests "without any legislative guidance" (Boreali v Axelrod, 71 NY2d 1, 6 [1987] [emphasis added]). Factors relevant to determining whether a regulation violates separation of powers include whether the agency "constructed a regulatory scheme laden with exceptions based solely upon economic and social concerns" (id. at 11-12); "did not merely fill in the details of broad legislation describing the over-all policies to be implemented" but instead "wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance" (id. at 13); "acted in an area in which the Legislature had repeatedly tried  and failed  to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions" (id.); and considered "no special expertise or technical competence in the [relevant] field" (id. at 14). These factors are not present here.
Although we find that some of the provisions of Insurance Regulation 208 lack a rational basis, we cannot conclude that DFS simply created policy on a clean slate to balance conflicting interests in the absence of legislative guidance (see id. at 11-14). In our view, Insurance Regulation 208 represents a valid exercise of DFS's general legislative authority and an appropriate elaboration of Insurance Law § 6409(d).
Petitioners state that some of the regulations are similar to legislation that has been expressly rejected by the Senate, and that the State Senate in January 2018 passed a bill to amend Insurance Law § 6409(d) to clarify that usual and customary inducements are permitted, but it has not advanced to the Assembly (2018 NY Senate Bill S6704). However, the recent passage of this bill by one house of the bicameral body falls short of demonstrating that the Legislature has been trying to change this policy (see Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 182-184 [2016] [finding this factor "close" but not weighing against the challenged regulation where Legislature considered and rejected 24 bills of varying relevance, but only 3 were passed by one house]).
We remand to Supreme Court for review of any arguments for affirmative relief raised in the petition that the court declined to reach because its grant of the petition rendered them academic.
Accordingly, order of the Supreme Court, New York County (Eileen A. Rakower, J.), entered on or about July 5, 2018, which granted the petition to annul Insurance Regulation 208, codified at 11 NYCRR 228 on October 18, 2017, effective December 18, 2017, should be modified, on the law, to deny the petition except as to section 228.5(a)(1)-(3) and (d)(1)-(2), and the proceeding brought pursuant to CPLR article 78 remanded to Supreme Court for further proceedings consistent herewith, and, otherwise affirmed, without costs.
[*10]M-4677 - N.Y. State Land Title Association, Inc. v N.Y. State Dept. of Financial Services
Motion to file amicus brief granted and brief deemed filed.
All concur.
Order, Supreme Court, New York County (Eileen A. Rakower, J.), entered on or about July 5, 2018, modified, on the law, to deny the petition except as to section 228.5(a)(1)-(3) and (d)
(1)-(2), and the proceeding brought pursuant to CPLR article 78 remanded to Supreme Court for further proceedings consistent herewith and otherwise affirmed, without costs.
M-4677 - N.Y. State Land Title Association, Inc. v N.Y. State Dept. of Financial Services
Motion to file amicus brief granted and brief deemed filed.
Opinion by Singh, J. All concur.
Sweeny, J.P., Gesmer, Oing, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JANUARY 15, 2019
CLERK



Footnotes

Footnote 1: 11 NYCRR 228.0, 228.2, 228.3, 228.4

Footnote 2: 11 NYCRR 228.5(d), 228.5(a)(1)-(3)

Footnote 3: A "Patriot search" apparently relates to a search of a terrorist list under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Pub L No 107-56, 115 Stat 272), commonly known as the USA Patriot Act or the Patriot Act.

Footnote 4: DFS argues that if this Court finds the 11 NYCRR 228.5(d) exception for independent closers to be invalid, the proper remedy is to extend the flat ban on in-house closers' additional fees to independent closers as well. But to do so would be "jurisprudentially unsound . . . since the product of such an effort would be a regulatory scheme that neither the Legislature nor the [DFS] intended" (Boreali v Axelrod, 71 NY2d 1, 14 [1987]). DFS promulgated section 228.5(d)(2) after a public hearing at which industry representatives raised concerns about the consequences of banning separate fees. DFS purportedly decided that the comments received at the hearing showed it to be unwise and unnecessary to ban certain closers from collecting any separate fees. If this Court were to annul only the independent closers exception, new regulations would be improperly judicially created without ever having been approved by the agency through the usual public hearing process.